# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

ASHLEY WARD and GREGORY MORRIS, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AIRLINE TARIFF PUBLISHING COMPANY; 3VICTORS, INC.; DELTA AIR LINES, INC.; UNITED AIRLINES, INC.; AMERICAN AIRLINES GROUP INC.; ALASKA AIR GROUP, INC.; HAWAIIAN HOLDINGS, INC.; SOUTHWEST AIRLINES CO.; and JETBLUE AIRWAYS CORPORATION,

Defendants.

Case No. 2:26-cv-4289

**COMPLAINT**

**<u>DEMAND FOR JURY TRIAL</u>**



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

# TABLE OF CONTENTS

Page

I. NATURE OF ACTION ........ 1

II. PARTIES ........ 4

A. Plaintiffs ........ 4

B. Defendants ........ 5

C. Co-Conspirators ........ 6

III. JURISDICTION AND VENUE ........ 6

IV. FACTUAL ALLEGATIONS ........ 7

A. Defendants Have Previously Conspired Through ATPCO-Supervised Information Exchanges ........ 7

B. The Rise of Dynamic Pricing Threatened to Disrupt the Filed-Fare System ........ 10

C. ATPCO Began Studying Dynamic Pricing and Commissioned Research on What It Would Do to Competition Among Airlines ........ 14

D. ATPCO's Study Found That Dynamic Pricing Would Make Airline Prices Harder to Watch and Easier to Undercut ........ 15

E. ATPCO's Answer to the Risk of Price Wars Was to Bring Airlines' Dynamic Prices Back to ATPCO ........ 25

F. ATPCO then Took a Series of Steps to Put Each Airline's Dynamic Prices into the Same Terms, in the Same Place, Under the Same Rules ........ 27

G. ATPCO Created and Administered a Give-To-Get Information Exchange System Where Airlines Pooled Their Confidential Dynamic Pricing Data in a Centralized Location ........ 33

H. ATPCO Created Iris as a Repository of Confidential Airline Pricing Information that Operates on a Give-To-Get Basis ........ 43

I. ATPCO Provides Pooled Data to Each Participating Airline Through Its PriceEye Product ........ 51

J. Public Sources Indicate that Alaska, Jetblue, Southwest, United, and American Use 3Victors ........ 55



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

K. Iris and PriceEye Completed the Process that ATPCO Had Started in 2019 After Identifying the Competitive Threat from Dynamic Pricing ............... 60

L. Domestic Air Travel Constitutes the Relevant Antitrust Market.......................... 62

1. Domestic Air Travel constitutes the relevant product market. ................. 62

2. The United States constitutes the relevant geographic market. ................ 63

M. The Airline Defendants Collectively Possess Market Power in the Relevant Market........................................................................................... 65

N. The Challenged Conduct Produces Anticompetitive Effects............................... 67

1. The information exchanged through ATPCO has the features that DOJ associates with harm to competition......................................... 67

2. The structure of the market compounds the anticompetitive effects of the challenged conduct........................................................... 73

3. Following the full roll-out of the ATPCO information exchange, airline prices soared. ............................................................... 76

V. CLASS ACTION ALLEGATIONS ........................................................................ 80

VI. CAUSES OF ACTION ........................................................................................ 83

COUNT I VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1 ................ 83

COUNT II VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1................ 87

COUNT III VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1............... 92

COUNT IV VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1 .............. 93

REQUEST FOR RELIEF ........................................................................................... 95

JURY TRIAL DEMANDED......................................................................................... 96



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Plaintiffs Ashley Ward and Gregory Morris (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendants Airline Tariff Publishing Company ("ATPCO"); 3Victors, Inc. ("3Victors"); American Airlines Group, Inc. ("American"); Delta Air Lines, Inc. ("Delta"); Alaska Air Group, Inc. ("Alaska Air Group") and Hawaiian Holdings, Inc. ("Hawaiian") (Alaska Air Group and Hawaiian, collectively, "Alaska"); and Plaintiff Ward, individually and on behalf of all others similarly situated, further asserts claims against United Airlines, Inc. ("United"); and Plaintiff Morris, individually and on behalf of all others similarly situated, further asserts claims against Southwest Airlines Co. ("Southwest"); and JetBlue Airways Corporation ("JetBlue") (American, Delta, Alaska, United, Southwest, and JetBlue, collectively, the "Airline Defendants"; all defendants, collectively, "Defendants"). Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief, including the investigation of counsel, as to all other matters.

## I. NATURE OF ACTION

1. For most of modern aviation history, the major commercial airlines have sought to solve a fundamental economic problem: how to avoid competing on price. Because an empty seat on a departing flight represents a total loss of potential revenue, the natural incentive of any airline is to discount that seat until a passenger buys it. Left to their own devices, airlines with unsold capacity will undercut one another until fares approach the marginal cost of flying. The airlines call this a "race to the bottom." The antitrust laws call it competition.

2. Over thirty years ago, the United States Department of Justice discovered exactly how the airlines were preventing this competition. They used a joint venture of their own creation called the Airline Tariff Publishing Company, or ATPCO. Through ATPCO, the airlines operated a massive, shared clearinghouse of advance pricing data. They used this system to signal planned fare increases and collude on their prices through sharing private data only available to them. The government sued, and federal consent decrees put a stop to it. The decrees mandated that ATPCO could only share what was already available to the ticket-buying public. But those decrees eventually expired.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

3. Today, the airlines have resurrected their arrangement. The underlying technology has evolved from the mainframe computers of the 1990s, but the anticompetitive design remains strictly the same. Through ATPCO, the defendants have engineered a new, highly sophisticated information exchange to monitor one another's pricing and artificially inflate the cost of air travel for millions of Americans.

4. The origin of this modern conspiracy lies in a technological shift that ought to have benefited the consumer. In the early 2010s, the industry began a transition toward "dynamic pricing"—a system where airlines bypass static, published fare lists to instantly calculate and offer a personalized price to a specific traveler. For consumers, dynamic pricing promised the return of genuine price competition through secret, individualized discounts.

5. For the airlines, however, dynamic pricing posed a structural threat. If an airline could offer a traveler a private discount that its rivals could not see in ATPCO's database, those rivals could not immediately retaliate. The old system of public fare filings—the bedrock airlines had long used to monitor one another and maintain a cooperative equilibrium—would collapse.

6. In 2016, ATPCO convened a "Dynamic Pricing Working Group" of the major carriers to study the danger. The findings were delivered at ATPCO's October 2017 industry conference, and they were stark. ATPCO displayed a slide illustrating exactly what happens when airlines can no longer watch each other. The presentation mapped a simulated price war: two airlines, blind to one another's private offers, trade discounts a dollar at a time, driving a $350 fare all the way down to the bare marginal cost of flying. The presentation warned the assembled industry that dynamic pricing "could reduce the ability of airlines to evaluate and respond to competitor price changes."[1] Without the ability to monitor the market, the airlines would be forced to compete on price.

7. In 2018, Michael D. Wittman—a researcher who co-authored ATPCO's own commissioned study—stated the industry's concern in plain English. The "greatest risk to the status quo of airline competition," he wrote, "is the reduced ability of airlines to monitor the

---

[1] *See infra* ¶ 56.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

pricing actions of their competitors." Without the ability to watch each other, airlines might actually have to compete. The remedy he proposed was a "market for information": "By giving airlines additional information about the pricing actions of their competitors, airlines could maintain pricing discipline without costly price wars."[2]

8. Over the next four years, ATPCO put airlines' dynamic prices into common terms and into its own systems. Working with the airlines, it wrote a standard under which each participating airline's dynamic price would be recorded as a known fare at a different amount, in the same terms ATPCO used for every airline's filed fares, and a record of it would go to ATPCO.[3] These prices stayed out of the fare data competitors read.[4] ATPCO also kept the offers no traveler bought, "for historical/analytical purposes," although its own guide stated that waiting until a ticket was sold "is sufficient to support revenue accounting and settlement requirements."[5] In 2022, ATPCO's chief executive wrote that ATPCO's board had approved the goal of building the framework for dynamically created airline offers, and that ATPCO would build it "leveraging the data airlines trust us with."[6]

9. In 2023, that framework became fully operational. In July of that year, ATPCO announced that its board had approved a cloud-based program allowing airlines to "analyze their collective shopping insights."[7] Eight of the eleven ATPCO board members in 2023 held pricing, revenue-management, or chief-revenue positions at their respective airlines. ATPCO's chief executive confirmed the program was already actively ingesting data, noting that "[m]ultiple airlines [are] already providing their shopping data, including dynamically generated pricing."[8] Five months later, ATPCO acquired 3Victors, a data firm offering a "single standardized stream

---

[2] *See infra* ¶¶ 60, 65.

[3] *See infra* ¶¶ 69–76.

[4] *See infra* ¶ 75.

[5] *See infra* ¶ 77.

[6] *See infra* ¶ 83.

[7] *See infra* ¶ 88.

[8] *See infra* ¶ 88.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

of flight shopping data."[9]

10. By 2025 and 2026, ATPCO had integrated this acquired technology into a two-part monitoring system: a central data repository called Iris and an analytics dashboard called PriceEye. Iris pools direct shopping data and dynamic prices straight from participating airlines' internal systems into a single, standardized stream. ATPCO does not simply sell this market intelligence. Instead, it operates on a strict "give-to-get" model: as 3Victors explains, "[p]articipation in Iris is based on a simple principle: the more you contribute, the more you receive."[10] In other words, airlines that contribute their own proprietary dynamic pricing data to Iris are rewarded with access to PriceEye. Built on top of the shared pool, PriceEye provides participants with "pricing alerts," "competitive benchmarking," and "anomaly detection," systematically stripping away the secrecy of individualized offers. 3Victors tells airlines that participating in Iris supplies the insight they need to "confidently monitor the competitive landscape and adjust pricing strategies as markets shift—hour by hour, not day by day."[11]

11. The result is a modern replication of the conduct the Department of Justice halted thirty years ago. In the 1990s, according to DOJ, airlines used ATPCO's data to track one another's fare changes. Today, they use ATPCO to share the granular shopping and pricing data that dynamic pricing would otherwise have kept secret. This exchange of non-public, competitively sensitive information restrains price competition in violation of Section 1 of the Sherman Act, artificially inflating the cost of air travel. Plaintiffs bring two claims against ATPCO and the airlines to halt this arrangement. The first is against ATPCO and its governing airlines for the conduct they directed. The second is against ATPCO and the participating airlines for executing the exchange.

## II. PARTIES

### A. Plaintiffs

12. Plaintiff Ashley Ward is a resident of Temecula, California. During the Class

---

[9] *See infra* ¶ 107.

[10] *See infra* ¶ 115.

[11] Data, 3Victors, https://www.3victors.com/data (last visited Nov. 3, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Period, she purchased domestic air passenger transportation directly from Southwest and paid artificially inflated fares as a result of Defendants' unlawful conduct.

13. Plaintiff Gregory Morris is a resident of Rockaway, New Jersey. During the Class Period, he purchased domestic air passenger transportation directly from United and paid artificially inflated fares as a result of Defendants' unlawful conduct.

**B. Defendants**

14. Defendant Airline Tariff Publishing Company is a District of Columbia corporation with its principal place of business in Herndon, Virginia. ATPCO is owned by a group of airlines that, on information and belief, includes Defendants American, Delta, and United. ATPCO's board includes representatives of eleven airlines. ATPCO serves as the database through which airlines publish their fares, and it standardizes and redistributes fare data across the travel industry. ATPCO also offers pricing tools of its own, including an algorithmic pricing tool called "Architect."

15. Defendant 3Victors, Inc. is a Delaware corporation. 3Victors was acquired by ATPCO in or about December 2023. 3Victors describes itself as "an ATPCO company" and, on information and belief, shares ATPCO's principal place of business in Herndon, Virginia. 3Victors operates the Iris shopping data repository and the PriceEye competitive intelligence product described in this Complaint.

16. Defendant American Airlines Group. Inc. is a Delaware corporation with its principal place of business in Fort Worth, Texas. American is a co-owner of ATPCO and, on information and belief, has subscribed to PriceEye and contributed shopping data to Iris ..

17. Defendant Delta Air Lines, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia. Delta is a co-owner of ATPCO. On information and belief, Delta participated in the information exchange alleged herein through PriceEye, Iris, ATPCO's data clean rooms, and/or its ownership and governance of ATPCO.

18. Defendant United Airlines, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. United is a co-owner of ATPCO. On information and belief, United participated in the information exchange alleged herein through PriceEye, Iris, ATPCO's


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

data clean rooms, and/or its ownership and governance of ATPCO.

19. Defendant Southwest Airlines Co. is a Texas corporation with its principal place of business in Dallas, Texas. On information and belief, Southwest has subscribed to and used PriceEye and contributed shopping data to Iris during the Class Period.

20. Defendant Alaska Air Group, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington. In or about July 2024, Alaska entered into an agreement with 3Victors for PriceEye, which 3Victors' announcement described as providing airlines "with best-in-class competitive pricing data."[12]

21. Defendant Hawaiian Holdings, Inc. is a Delaware corporation with its principal place of business in Honolulu, Hawaii. Hawaiian's chief revenue officer was a member of ATPCO's board from 2014 until 2024. On information and belief, Hawaiian participated in the information exchange alleged herein through PriceEye, Iris, ATPCO's data clean rooms, and/or participating in the governance of ATPCO. Alaska Air Group acquired Hawaiian on September 18, 2024.

22. Defendant JetBlue Airways Corporation is a Delaware corporation with its principal place of business in Long Island City, New York. On information and belief, JetBlue has subscribed to PriceEye and contributed shopping data to Iris.

### C. Co-Conspirators

Various other persons, firms, and corporations not named as defendants, including other airlines that own, govern, or participate in ATPCO, PriceEye, Iris, or ATPCO's data clean rooms, have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name additional co-conspirators as defendants.

## III. JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court also has jurisdiction

[12] 3Victors, *Alaska Airlines Signs PriceEye Deal with 3Victors* (July 11, 2024), https://www.3victors.com/post/alaska-airlines-signs-priceeye-deal-with-3victors (last visited Nov. 3, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

under 28 U.S.C. § 1332(d) because this case is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of each Class, and at least one member of each Class is a citizen of a State different from at least one Defendant.

24. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacts business, is found, or has agents in this District; because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and because a substantial portion of the affected interstate trade and commerce was carried out in this District. Each Airline Defendant operates flights to and from Seattle-Tacoma International Airport and/or other airports serving this District, sells tickets to residents of this District, and maintains employees, facilities, or agents here. As to all other Defendants, venue is proper in this District under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in this District, in which Alaska maintains its headquarters and, upon information and belief, where it engaged in the allegedly wrongful acts.

25. This Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22, which provides for nationwide service of process, and because each Defendant (a) transacted business throughout the United States, including in this District; (b) sold air passenger transportation throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an illegal conspiracy directed at, and with the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this District.

26. Defendants' conduct was within the flow of, was intended to, and did have a substantial effect on interstate commerce of the United States, including in this District.

## IV. FACTUAL ALLEGATIONS

### A. Defendants Have Previously Conspired Through ATPCO-Supervised Information Exchanges

27. ATPCO maintains a database of airline fare information used by travel agents and



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

others across the travel industry. For decades, airlines have used ATPCO's database to advertise fares to travelers and travel agents. Each fare in ATPCO's database includes not only a route (an origin and a destination) and a price, but also a set of fare "rules" governing details things like whether a ticket is refundable. For any given scheduled flight, an airline may advertise a variety of different fares with different prices and rules.

28. Traditionally, airlines have offered the same set of fare options to all (or almost all) passengers, and they have published those fares in ATPCO's database. Relying on this fact, airlines have traditionally used ATPCO's database both to advertise their own fares to travelers and travel agents, and to monitor other airlines' fares to inform their own pricing strategies.

29. On December 21, 1992, the United States Department of Justice ("DOJ") sued ATPCO and eight airlines in the United States District Court for the District of Columbia: Alaska Airlines, American Airlines, Continental Airlines, Delta Air Lines, Northwest Airlines, Trans World Airlines, United Air Lines, and USAir. *United States v. Airline Tariff Publishing Co.*, No. 92-2854 (D.D.C.) (the "1992 Action"). The suit followed what DOJ called an "intensive three-year investigation of airline pricing practices."[13]

30. DOJ alleged that ATPCO was "wholly owned by a group of airlines that includes the airline defendants," and described it as "a joint venture in which all of the airline defendants are co-owners."[14]

31. DOJ's case centered on fares that existed in ATPCO's data but could not be bought. An airline could file a fare with a "first ticket date" in the future. The fare then went into ATPCO's database and out to competing airlines, but no traveler could purchase a ticket at that fare until the first ticket date arrived. According to DOJ, the airlines used these filings, and the codes attached to them, to communicate with one another. DOJ alleged that from April 1988

[13] Complaint, *United States v. Airline Tariff Publishing Co.*, No. 92-2854 (D.D.C. Dec. 21, 1992), https://www.justice.gov/atr/case-document/file/483631/dl (last visited Nov. 3, 2026) ("1992 Compl."); *Justice Department Files Price Fixing Suit Against Eight Airlines and Fare Dissemination System*, Dept. of Justice (Dec. 21, 1992), https://www.justice.gov/archive/atr/public/press_releases/1992/211323.htm (last visited Nov. 3, 2026).

[14] 1992 Compl. ¶ 3; Competitive Impact Statement, *United States v. Airline Tariff Publishing Co.*, No. 92-2854 (D.D.C. Dec. 21, 1992), at p. 14, https://www.justice.gov/atr/case-document/file/627946/dl (last visited Nov. 3, 2026) ("1992 Competitive Impact Statement").


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

through at least May 1990, the airline defendants used ATPCO to exchange proposals for fare increases, to negotiate them, and to give one another assurances about their size and timing.[15]

32. DOJ also alleged that the airlines drew from ATPCO's data what the public could not. The airlines ran ATPCO data through "sophisticated computer programs to produce detailed daily reports" that let them "identify and track their competitors' proposed changes to fares."[16] Travel agents, who sold tickets through computer reservation systems ("CRSs"), had no comparable way to sort or analyze the same data.[17]

33. DOJ's second claim did not depend on any particular agreement to raise a fare. It more broadly alleged, under the rule of reason, that the airlines operated their shared system in a manner that "unnecessarily facilitates coordinated interaction," meaning in ways that distributing fares did not require. DOJ stated that this claim was "based on the airline defendants' joint ownership and participation in [ATPCO]."[18]

34. United and USAir settled in a decree entered in 1993 and ATPCO and the other six airlines settled in a decree entered in 1994.[19] The decrees limited what the airlines could learn about one another through ATPCO to the public's view of the market: fares actually on sale and available to the public.[20] Under the decrees, airline could no longer use its fare filings to tell competitors about fares it planned to charge, or to send any other information about its future pricing.[21] Nor could it let competing airlines see the internal codes it used to manage its own

---

[15] 1992 Competitive Impact Statement at p.2; 59 Fed. Reg. 15225 (Mar. 31, 1994).

[16] 59 Fed. Reg. 15225 (Mar. 31, 1994), available at https://www.govinfo.gov/content/pkg/FR-1994-03-31/html/94-7672.htm.

[17] *Id.*; 1992 Competitive Impact Statement at p.9.

[18] 59 Fed. Reg. 15225 (Mar. 31, 1994).

[19] *United States v. Airline Tariff Publishing Co.*, 836 F. Supp. 9 (D.D.C. 1993); Final Judgment, *United States v. Airline Tariff Publishing Co.*, No. 92-2854 (D.D.C. Nov. 1, 1993), https://www.justice.gov/atr/final-judgment-us-v-airline-tariff-publishing-company-et-al (last visited Nov. 3, 2026) ("1993 Decree"); Final Judgment, *United States v. Airline Tariff Publishing Co.*, No. 92-2854 (D.D.C. Aug. 10, 1994), https://www.justice.gov/atr/case-document/file/483611/dl (last visited Nov. 3, 2026) ("1994 Decree").

[20] *See* 1993 Decree § IV(D); 1994 Decree § IV(A)(4).

[21] 1993 Decree § IV(B); 1994 Decree § IV(A)(2).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

fares.[22]

35. The 1994 Decree also bound ATPCO itself. ATPCO could not pass along fares that were not yet for sale, and it could not show one airline's internal codes to another. It could not show any airline a change to a competitor's fares before sending that change to the reservation systems travel agents used, and it could not update fares faster than those systems could.[23] In short, ATPCO could not give an airline information about its rivals' fares that the travel agents selling those fares did not also have.[24]

36. Each decree lasted ten years. On August 6, 2004, four days before the 1994 Decree expired, DOJ asked the court to hold American Airlines in civil contempt.[25] DOJ alleged that American had published fares with future travel dates that had "little or no relevance for consumers," and described ATPCO as "a company jointly owned by American and a number of other airlines" through which "[m]ost domestic airline fares are disseminated."[26] The court barred American from "using travel dates to initiate or match a fare increase" and imposed a $3,000,000 civil penalty, under an order that ran for seven years.[27] The last consent decree expired in 2011.

**B. The Rise of Dynamic Pricing Threatened to Disrupt the Filed-Fare System**

37. For decades, airlines set ticket prices in two steps. First, an airline filed a set of fares with ATPCO, each tied to a booking class and its own rules on advance purchase, refundability, and the like. Then the airline's revenue-management software decided which of those booking classes remained open for sale on each flight. A traveler was always offered one

---

[22] 1993 Decree § IV(C); 1994 Decree § IV(A)(3).

[23] 1994 Decree § IV(B).

[24] *See id.*

[25] Petition of the U.S. for an Order to Show Cause Why Respondent Am. Airlines, Inc. Should Not Be Found in Civil Contempt, *United States v. Am. Airlines, Inc.*, No. 92-2854 (D.D.C. Aug. 6, 2004), https://www.justice.gov/atr/case-document/file/483586/dl (last visited Nov. 3, 2026).

[26] *Id.* at ¶¶ 4, 9.

[27] Settlement Agreement & Order, *United States v. Am. Airlines, Inc.*, No. 92-2854 (D.D.C. Sept. 23, 2004), at §§ IV, VII, https://www.justice.gov/atr/case-document/file/483566/dl?inline= (last visited Nov. 3, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

of the filed fares. What changed from day to day was which filed fares remained available.

38. A presentation at ATPCO's October 2017 industry conference, Elevate 2017, illustrated how this worked.[28] In the presentation's example, an airline filed four fares with ATPCO for a flight.[29] The fares were $400 with no restrictions, $300 bought at least three days ahead, $200 bought at least seven days ahead, and $100 bought at least fourteen days ahead, and the cheaper fares could not be refunded or changed.[30] The airline's revenue-management system then set limits on how many seats could be sold at each fare.

39. The 2017 presentation described this approach as choosing prices from "a pre-set menu of possible price points."[31] The price a traveler was offered depended on which items on that menu the airline still had open, not on a price computed for that traveler.




40. Because every airline filed its fares through ATPCO, each airline could see the

[28] Tom Gregorson, *Dynamic Pricing*, ATPCO (Oct. 2017), https://www.slideshare.net/slideshow/elevate-2017-pricing-evolution-the-road-to-dynamic-offer-generation-82074068/82074068 (last visited Nov. 3, 2026) ("2017 ATPCO Presentation")

[29] *Id.* at slide 13.

[30] *Id.*

[31] *Id.* at slide 19.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

full set of fares its competitors had filed. In 2013, DOJ alleged that "all airlines have complete, accurate, and real-time access to every detail of every airline's published fare structure" through ATPCO.[32] ATPCO itself later described airlines as having "driven their pricing strategy and competitive responses by managing availability" within that structure.[33]

41. In the early 2010s, the airline industry began building a different way to sell tickets. Under the existing system, an airline's prices reached travel agents and travelers as fares filed in advance through ATPCO. In October 2012, the International Air Transport Association ("IATA"), the airline industry's global trade association, adopted Resolution 787. The resolution set out goals for a new standard called the New Distribution Capability ("NDC"). NDC was a common format that would let an airline answer a shopper's request directly, with an offer assembled for that request. Among the resolution's stated goals was the "capability to provide personalized pricing offers to consumers who shop for air transportation."[34] IATA told the United States Department of Transportation ("DOT") that NDC would let carriers "customize service and amenity packages and prices based on consumer attributes."[35]

42. NDC opened the possibility of prices that never passed through ATPCO. An airline using NDC could compute a price in response to each request and send it directly to the traveler or travel agent, without choosing from fares filed in advance. In DOT's proceeding on Resolution 787, airlines supporting the resolution said it would allow "airlines to directly present offers to the consumer."[36] Opponents told DOT that under NDC, airlines "would no longer have to file publicly available fares."[37]

---

[32] Complaint, *United States v. US Airways Grp., Inc.*, No. 1:13-cv-01236 (D.D.C. Aug. 13, 2013), ¶ 44, https://www.justice.gov/atr/case-document/file/514531/dl (last visited Nov. 3, 2026).

[33] *Dynamic Pricing: Definition, Impact, and Current Capabilities*, ATPCO, at p. 4, https://d3i59dyun0two3.cloudfront.net/wp-content/uploads/media/2025/01/14144915/dynamic-pricing-capabilities-whitepaper.pdf (last visited Nov. 3, 2026) ("ATPCO Dynamic Pricing").

[34] Order to Show Cause, Action on IATA Agreement Issued by the Dept. of Transportation, Docket No. OST-2013-0048, Order 2014-5-7, at 2 (May 21, 2014), https://www.transportation.gov/sites/dot.gov/files/docs/IATA_Res_787_showcause.pdf (last visited Nov. 3, 2026).

[35] *Id.*

[36] *Id.* at 3.

[37] *Id.* at 4.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

43. By 2014, the major U.S. airlines were describing an industry transition to dynamic pricing. In comments to DOT, Airlines for America ("A4A"), the trade association of the major U.S. airlines, stated that "new technologies enable the airlines to price their products and services in a dynamic way" and that "the strong trend in pricing ancillary services is customized pricing."[38]

44. By 2015, ATPCO had begun studying how to respond to the rise of dynamic pricing. That year it published a white paper on the subject. The paper opened with the concern its business now faced: "There is a perception today that NDC will replace filed fares."[39] It reported that airlines were "contemplating and implementing even further personalization of pricing and product based on customer value."[40]

45. At about the same time, ATPCO said that airlines wanted it to remain at the center of airline distribution. Thomas Gregorson, who led product strategy at ATPCO, said that airlines supported ATPCO serving as their "infrastructure and central conduit for all distribution (NDC and traditional)."[41] He acknowledged that ATPCO's existing capabilities "may not be enough for the future."[42] The interview reported that "[a] multidisciplinary industry working group has been set up that will look at the next level of dynamic pricing capabilities."[43] The working group that ATPCO formed in early 2016 included approximately 20 airlines.[44]

---

[38] David A. Berg, Airlines for America Response to Notice of Proposed Rulemaking titled *Transparency of Airline Ancillary Fees & Other Consumer Protection Issues*, Docket DOT-OST-2014-0056, at 4, 25 (Sept. 29, 2014), https://airlines.org/wp-content/uploads/2014/09/A4A-Full-GDS-Comments.pdf (last visited Nov. 3, 2026) ("A4A Comments").

[39] ATPCO Dynamic Pricing at 2.

[40] *Id.* at 5.

[41] *Executive Interview: Thomas Gregorson, Airline Information*, Ai, http://airline.information.org/opinion/executive-profiles/878-executive-interview-thomas-gregorson-md-product-strategy-development-tpco.html (last visited Nov. 3, 2026).

[42] *Id.*

[43] *Id.*

[44] Melanie Dezelak & Richard Ratliff, *Towards new industry-standard specifications for air dynamic pricing engines*, J. Revenue & Pricing Mgmt. 17:394 (2018), Springer Nature Link, https://link.springer.com/article/10.1057/s41272-018-0148-y (last visited Nov. 3, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

## C. ATPCO Began Studying Dynamic Pricing and Commissioned Research on What It Would Do to Competition Among Airlines

46. In early 2016, ATPCO formed a Dynamic Pricing Working Group (the "Working Group") "to address airline requirements for creating customized offers."[45] Its members were about 20 airlines, three global distribution systems (or "GDSs," which are the reservation networks travel agents use to search for and book flights), and "several marketing and technology providers."[46]

47. ATPCO commissioned research on what dynamic pricing would mean for airlines.[47] The resulting study was prepared for ATPCO by PODS Research LLC (the "PODS Study"), and its authors were Peter Belobaba, a principal research scientist at the Massachusetts Institute of Technology's International Center for Air Transportation, William Brunger, and Michael D. Wittman.[48]

48. ATPCO presented the PODS Study to the industry at its annual conference, Elevate 2017, in October 2017. The session was led by Tom Gregorson, then ATPCO's Vice President of Products & Solutions, and Belobaba presented the study's findings. ATPCO explained that it commissioned the study "to review current and next-generation pricing practices in the airline industry."[49] One of its four stated purposes was to "[a]ssess potential implications of next-generation pricing on revenues, competition, customers, and internal processes."[50]

---

[45] *Id.*

[46] *Id.*

[47] Peter P. Belobaba, *et. al.*, *Discussion Paper Advances in Airline Pricing, Revenue, Management, and Distribution Implications for the Airline Industry*, PODS Research LLC (Oct, 2017), https://d3i59dyun0two3.cloudfront.net/wp-content/uploads/media/2025/01/14144903/pods-summary-paper.pdf (last visited Nov. 3, 2026).

[48] *Id.*

[49] 2017 ATPCO Presentation at slide 12.

[50] *Id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX




**D. ATPCO's Study Found That Dynamic Pricing Would Make Airline Prices Harder to Watch and Easier to Undercut**

49. Filed fares produce a list of prices that every competitor can read in ATPCO's data. Dynamic pricing produces a stream of individual offers, each seen only by the traveler who asked. Moving from the first system to the second would take away something airlines had relied on for decades: the ability to see what their competitors charged. Under filed fares, an airline that lowers a price does so in full view of its rivals. They can see the change in ATPCO's data within hours and decide whether to match it. Under dynamic pricing, a lower price offered to a single traveler leaves no trace in that data, and rivals may never learn of it.[51]

50. ATPCO's own examples show the difference. Under the traditional system of filed fares, an airline files a short list of fares for a flight, in the study's illustration $400, $300, $200, and $100, and its software decides which of them remain for sale. Every traveler is offered a price from that list, and every competing airline can read the same list in ATPCO's data. Under dynamic pricing, the airline instead would "[s]elect prices freely from among a continuous range of possible values," in the presentation's illustration anywhere from $199 to $499.[52] In the most

[51] *Id.* at slides 13, 15–16, 19; *supra* ¶¶ 27–28 (filed-fare system).

[52] 2017 ATPCO Presentation at slide 15.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

dynamic form, the presentation explained, "prices are computed individually for each transaction."[53] One traveler searching for the flight might be offered $214 and the next $361. Neither price exists until the traveler asks, and neither appears on any list a competitor can read.




51. ATPCO's own analysis showed that airlines would lose price monitoring capability by pricing dynamically. The table compared airlines with industries that already priced dynamically, and one of its columns asked whether each had a "Publicly-Available Price Structure?"[54] A price structure is the complete set of prices a seller will charge and the conditions attached to each. Airlines had made theirs available to one another for decades. Every fare, with its booking class and rules, sat in ATPCO's data before any traveler bought a ticket, and every competing airline could read it.[55] ATPCO marked airlines "Yes," it marked online retail and Airbnb "No."[56] A retailer that sets a price for each shopper publishes no list at all. A competitor that wants to know what that retailer charges sees only the price it is shown when it searches, and the next shopper may be shown a different one.

---

[53] *Id.* at slide 16.

[54] *Id.* at slide 17.

[55] *See supra* ¶¶ 27–28.

[56] 2017 ATPCO Presentation at slide 17.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Pricing Mechanisms in a Variety of Industries Were Reviewed

| | Industry | Pricing Mechanism | Publicly-Available Price Structure? |
|---|---|---|---|
| Travel-Related w/ Asst. Opt. | Airlines | Assortment optimization | Yes |
| | Hotels | Assortment optimization | No |
| | Passenger rail | Assortment optimization | Yes |
| | Rental cars | Assortment optimization | No |
| Industries with Advanced Pricing | Online Retail | Dynamic price adjustment | No |
| | Airbnb | Continuous pricing | No |
| | On-demand transport | Dynamic price adjustment & transactional continuous pricing | Yes/No |

52. ATPCO's research also showed that dynamic pricing would let an airline discount more often, and to narrower groups of travelers, than filed fares allowed. Certain types of dynamic pricing would let an airline price below its filed fares. Under filed fares, the lowest price an airline could offer at any moment was the cheapest fare it had filed and left open for sale. A dynamic pricing engine could go below that fare for a single request, offering a discount to a traveler the engine estimated would pay less.[57]

[57] *See id.* at slide 24.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX




53. ATPCO's simulations showed why an airline would want to discount this way. In every demand scenario ATPCO tested, a simulated airline earned more by offering dynamic discounts than by raising prices for travelers willing to pay more. Discounting added as much as 3.7 percent to its revenue, while raising prices added at most 1.3 percent, and the gap was widest when demand was lowest.[58]

[58] *Id.* at slide 26.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX




54. Empty seats explain the gap. Airlines are businesses "with high fixed costs and low marginal costs."[59] Once a flight is scheduled, most of the cost of operating it is paid whether the seats are full or empty. Carrying one more passenger adds only a small cost, such as slightly more fuel and the cost of processing the ticket. Economists call that added cost "marginal cost." An airline with 20 unsold seats on a flight a week before departure earns nothing from any seat that leaves empty. If a $40 discount persuades a traveler to buy one of those seats for $160 instead of $200, the airline takes in $160 it would otherwise have lost, less its marginal cost of carrying that passenger. Any fare above marginal cost leaves the airline better off than an empty seat. Every competing airline with empty seats can make the same calculation. An airline that discounts to win a traveler gives a competitor a reason to discount further to win the traveler back. Each new discount makes sense to the airline offering it, because any fare above marginal cost earns more than an empty seat. When two airlines can each respond to the other's discount with one of their own, nothing stops the exchange until one of them reaches marginal cost.

[59] Michael D. Wittman, *Dynamic Pricing Mechanisms for Airline Revenue Management: Theory, Heuristics, and Implications*, Ph.D. diss., Mass. Inst. of Tech. (Feb. 20, 2018), p. 183, https://dspace.mit.edu/entities/publication/1170e447-7842-4b61-8184-82152f7b45b3 (last visited Nov. 3, 2026) ("Wittman Dissertation").


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

55. ATPCO's research identified the risk explicitly: that once competing airlines could each discount one traveler at a time, they could undercut one another until fares fell to marginal cost. In a slide titled "Implications for Airline Competition," ATPCO identified that "[t]here may be an incentive for each firm to undercut the other until one firm reaches its marginal cost."[60] ATPCO's slide illustrated a price war between two airlines. Its table showed two airlines, "AL1" and "AL2," each starting at a fare of $350.[61] AL1 cut its fare by a dollar, to $349.[62] AL2 answered by going a dollar lower, to $348, and AL1 went to $347.[63] Each cut was small, and each answered the other airline's last price. A traveler choosing between two otherwise similar flights buys the cheaper one, so an airline that does not match or beat its competitor's fare loses the sale. The table continued down until AL1 reached $99, one dollar below AL2's $100, which the slide labeled "(MC)," for marginal cost.[64] In the illustration, neither airline chose $100 as its price. Each reached it by answering the other's last cut, and fares ended more than 70 percent below where they began.

[60] 2017 ATPCO Presentation at slide 27.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX




56. ATPCO's slide named one remedy for that price war, and the remedy was information: competition "[c]ould [be] mitigated by the availability of improved pricing data."[65] The same presentation also addressed what next-generation pricing could mean for airlines' view of their competitors: it reported the industry concern that next-generation pricing "could reduce the ability of airlines to evaluate and respond to competitor price changes."[66]

57. The war above occurs because each cut pays off for as long as it goes unanswered. If AL2 does not learn of AL1's cut for days, AL1 captures days' worth of bookings at the lower fare, and the cut is worth making. If AL2 sees the cut within hours and matches it, AL1 gains almost nothing, and the cut is not worth the risk of a broader price war. That is why the slide concluded that this competition "could [be] mitigated by the availability of improved pricing data": the better each airline can see what the other charges, the faster it can answer a cut, and the less any cut is worth starting.[67]

58. Filed fares previously gave airlines that view of one another. As one of the PODS authors explained, "Publicly filed fare[s] allow airlines to perfectly monitor when their

---

[65] *Id.*

[66] *Id.* at slide 33.

[67] *Id.* at slide 27.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

competitors make pricing changes and react accordingly, including the possibility of responding with fare wars or punishments when undercutting is detected."[68] According to DOJ, in the years before its 1992 suit, the airlines ran ATPCO's data through "sophisticated computer programs to produce detailed daily reports" that let them "identify and track their competitors' proposed changes to fares."[69] Two decades later, DOJ alleged that every airline still had "complete, accurate, and real-time access" to every competitor's published fares through ATPCO.[70] But a discount offered by dynamic pricing to one traveler at a time would leave no trace in that data.

59. If airlines could see their competitors' dynamic prices as they once saw filed fares, the price war on ATPCO's slide would lose its reason to start. That is the remedy one of the PODS Study's authors proposed. In February 2018, Michael D. Wittman completed a doctoral dissertation at the Massachusetts Institute of Technology titled "Dynamic Pricing Mechanisms for Airline Revenue Management: Theory, Heuristics, and Implications" (the "Wittman Dissertation"). In it, Wittman thanked "the members of the MIT PODS Consortium," an industry-funded group whose members in 2020 included ATPCO, Alaska, Delta, and United, "for their financial support and for their many helpful suggestions and comments as this work evolved."[71] Belobaba, the PODS Study's first-listed author, supervised it.[72] Wittman wrote that the study's third author, William Brunger, had "inspired Chapter 6 of this dissertation."[73] Chapter 6, titled "Implications of Dynamic Pricing for the Airline Industry," opens with the question, "Will dynamic pricing cause a race to the bottom?"[74] The abstract describes the dissertation's focus as "airline concerns that dynamic pricing could lead to price wars, excessive

---

[68] Wittman Dissertation at 184.

[69] 59 Fed. Reg. 15225 (Mar. 31, 1994), available at https://www.govinfo.gov/content/pkg/FR-1994-03-31/html/94-7672.htm.

[70] *See supra* ¶ 40.

[71] Wittman Dissertation at 5; Current Projects, MIT Int'l Ctr. for Air Transp., https://icat.mit.edu/?p=46 (last visited Nov. 3, 2026) ("The PODS Consortium at MIT is funded by 14 industry members that in 2020 include Air Canada, Alaska, Amadeus, ATPCO, Boeing, Delta, Etihad, IAG, LATAM, Lufthansa Group, PROS, Qatar, Sabre and United.").

[72] Wittman Dissertation at 3.

[73] *Id.* at 5 & title page.

[74] *Id.* at 181.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

discounting, and a race to the bottom."[75]

60. The dissertation's conclusion identified the loss of airlines' view of one another's prices as the greatest risk dynamic pricing posed to airline competition. It proposed the same remedy as ATPCO's slide: "[T]he facet of dynamic pricing that poses the greatest risk to the status quo of airline competition is the reduced ability of airlines to monitor the pricing actions of their competitors. Unlike traditional pricing and RM [revenue management], in which filed fare structures can easily be observed by all airlines, dynamic price adjustments may be targeted to specific customers, making it more difficult for airlines to know when their competitors are discounting. **This could lead to the possibility of price wars, as airlines react to real or perceived pricing actions by their competitors.**[76]

61. Wittman discussed in detail how airlines' view of one another's prices during the filed rate system had kept price wars from starting. It used a term from economics, the "cooperative equilibrium."[77] In a cooperative equilibrium, competitors keep prices above the competitive level without any express agreement, because each expects that undercutting would be seen and punished. To "defect" from the equilibrium is to undercut.[78] Airlines compete against the same rivals across much of their networks, year after year, so each has reason to expect that a cut will be answered. The dissertation identified that repeated competition, together with filed fares, as what held airlines in the equilibrium: "Most importantly, repeated multimarket interactions and the public nature of filed fare structures serve as monitoring and punishment mechanisms for airlines that defect from the cooperative equilibrium."[79]

62. Wittman explained that when competitors cannot see one another's prices, undercutting becomes harder to punish and therefore more tempting. "If the firm cannot observe when its competitors are cheating," it stated, "it may be more difficult to apply punitive actions,

---

[75] *Id.* at 3.

[76] *Id.* at 217-218 (emphasis added).

[77] *Id.* at 40-41, 191-93.

[78] *Id.* at 191-92; Edward J. Green & Robert H. Porter, Noncooperative Collusion under Imperfect Price Information, 52 Econometrica 87 (1984).

[79] Wittman Dissertation at 202.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

weakening cooperative equilibria."[80] When firms receive only private information about competitors' actions, "cooperation becomes even more difficult," and "[t]he difficulty of punishment in this setting increases the incentives to defect."[81] The dissertation relied on the Green and Porter article cited above, titled "Noncooperative Collusion under Imperfect Price Information."[82] In that model, firms cannot observe one another's conduct directly. A firm whose sales fall cannot tell whether a competitor cheated or demand unexpectedly dropped, an event economists call a "demand shock."[83] The clearer the signal, the fewer the price wars. As the dissertation put it, "price wars will happen less often and for shorter periods *T* when the chance of the demand shock α is low, because it will be more obvious when firms are deviating from the cooperative equilibrium."[84]

63. Wittman identified dynamic pricing as the situation in which airlines could no longer see one another's prices. Discussing economic research on "secret price cuts," it described that research as "a good representation of the dynamic pricing scenario with privately filed fares," in which "airlines would be unable to see each others' prices, and could choose to charge prices lower than the filed fares for some customers."[85] It called "a move away from publicly filed fares" "the facet of dynamic pricing that has the potential to lead to the greatest changes to airline competition in regards to the race to the bottom."[86] It returned to the point in its summary of the chapter: "The feature of dynamic pricing that could most likely lead to a race to the bottom is if dynamic pricing requires airlines to partially move away from publicly-filed fares. In this case, it may be more difficult for airlines to observe the pricing actions of their competitors, and could allow airlines to practice secret price cuts."[87]

---

[80] *Id.* at 197.

[81] *Id.* at 198.

[82] *Id.* at 197-98 & bibliography.

[83] *Id.* at 197-98; Green & Porter, *supra*.

[84] Wittman Dissertation at 198.

[85] *Id.* at 199.

[86] *Id.* at 196.

[87] *Id.* at 202.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

64. Wittman emphasized that airlines themselves had raised this concern. He stated that "airlines have expressed concerns that dynamic pricing specifically will spur a race to the bottom," and that "[t]he lack of public monitoring of dynamic pricing actions has often been cited by airlines as a key concern in reference to the race to the bottom."[88] He added that "airlines may need to reconsider how they monitor and respond to the pricing actions of their competitors."[89]

### E. ATPCO's Answer to the Risk of Price Wars Was to Bring Airlines' Dynamic Prices Back to ATPCO

65. The answer to the risks of price wars from dynamic pricing was more information, supplied by a market built for that purpose. Wittman explained that the risks of dynamic pricing "could be mitigated through the creation of a market for information for dynamic price adjustment decisions. By giving airlines additional information about the pricing actions of their competitors, airlines could maintain pricing discipline without costly price wars."[90] Wittman explained that "Direct communication between firms regarding pricing is generally illegal for reasons of antitrust. Yet this does not mean that monitoring is impossible. Technology companies currently exist that monitor the lowest available fares of airlines and sell that information to competitors. It is very likely that similar technology would emerge to monitor dynamic pricing behavior."[91] That monitoring would not need to be immediate to work: "Even if this monitoring is not conducted in real-time, it may still serve as a deterrent to short-term undercutting."[92] Wittman concluded that "new monitoring technologies… would help prevent the race to the bottom as a result of dynamic pricing in the long run."[93]

66. ATPCO had already begun building a dynamic pricing system in which airlines' dynamic prices would still end up at ATPCO. At the Elevate 2017 industry conference, ATPCO

---

[88] *Id.* at 194, 196; *see also id.* at 3, 181, 209.

[89] *Id.* at 201.

[90] *Id.* at 218.

[91] *Id.* at 200.

[92] *Id.*

[93] *Id.* at 218.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

first depicted the price war between airlines that would arise from dynamic prices that competitors could not see.[94] Eight slides later, ATPCO employees invited airlines to try a different version of dynamic pricing, where the prices would remain visible.[95] ATPCO proposed a pilot run through ATPCO where each airline's pricing engine would adjust the fares the airline had filed through ATPCO, and the adjusted price would then be filed with ATPCO as a "private fare," which ATPCO receives but does not distribute publicly.[96] ATPCO's own diagram of the pilot labeled that step "DPE Private Fare Filing."[97]




67. Under that design, the prices that dynamic pricing would remove from public fare data, and so from competitors' view, would still be collected, airline by airline, at ATPCO. According to Wittman, "the ATPCO Working Group ha[d] proposed filing all DPE adjustments as private fares with ATPCO" to "ensure that DPE-adjusted fares can be tracked and verified."[98]

68. In February 2018, the month Wittman completed his dissertation, ATPCO announced the first acquisition in its history. It bought Routehappy, which the announcement

[94] 2017 ATCPO Presentation at slide 27.

[95] *Id.* at slide 34-35.

[96] *Id.* at slide 8.

[97] *Id.*

[98] Wittman Dissertation at 27.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

called a "Rich Content Provider."[99] In the announcement, ATPCO described itself as "the leading source for airline industry pricing and shopping data" and stated that "ATPCO is owned by airlines."[100]

**F. ATPCO then Took a Series of Steps to Put Each Airline's Dynamic Prices into the Same Terms, in the Same Place, Under the Same Rules**

69. In the years after Elevate 2017, ATPCO wrote the standard for recording airlines' dynamic prices. Under that standard, a participating airline's dynamic price would be expressed in the same terms ATPCO used for every airline's filed fares, and a record of it would be sent to ATPCO, including when no traveler bought it. It launched a tool for standardizing fare data from multiple sources and bought a product that airlines used to track competitors' fare changes.

70. Working with the airlines in the Working Group, ATPCO developed a technical standard for recording dynamic prices. A standard, in this sense, is a common set of rules for recording one kind of information. ATPCO's filed-fare system had long worked as a standard of this kind. Every airline filed each fare with the same details, such as its booking class and the rules attached to it, in the same format.[101] The new standard would do the same for the dynamic prices that an airline's software sets at the moment a traveler searches.

71. ATPCO's standard recorded each dynamic price in the terms ATPCO already used for filed fares. The airline's pricing engine started from a fare the airline had filed, which the standard called the "baseline fare," and changed only its amount. The adjusted price kept the baseline fare's booking class, brand, and rules for changes and refunds, and its record matched the baseline fare's record except for the price.[102]

72. Recording prices in the same terms is what makes them comparable. A competing

[99] ATPCO Press Release, *Airline Data Platform ATPCO Acquires Rich Content Provider Routehappy*, Globe Newswire (Feb. 1, 2018), https://www.globenewswire.com/news-release/2018/02/01/1329917/0/en/Airline-Data-Platform-ATPCO-Acquires-Rich-Content-Provider-Routehappy.html (last visited Nov. 3, 2026).

[100] *Id.*

[101] *See supra* ¶¶ 27–28.

[102] ATPCO, Adjusted Pricing via Dynamic Pricing Engine (DPE) Implementation Guide (draft Feb. 2020) (the "DPE Guide"), at 12, 19–20, 26, https://blog.atpco.net/sites/atpco-public/files/2019-09/dynamic-pricing-dpe_impguide.pdf (last visited Nov. 2, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

airline that learns only that a traveler was offered $214 does not know whether the ticket could be refunded or changed, what booking class it was sold in, or what rules came with it. Therefore, so it cannot tell whether $214 was a deep discount or an ordinary fare. Under ATPCO's standard, that offer would be recorded as a particular filed fare, whose class and rules are already described in ATPCO's data, at a particular amount. Because every participating airline's dynamic prices would be recorded the same way, one airline's prices could be set beside another's. A reader of those records could see, for example, that one airline had offered a nonrefundable economy fare at $40 below the amount it filed, and that a competitor had offered the same kind of fare at $15 below its own. (The figures are illustrative.).

73. ATPCO's chief commercial officer has made the same point: "Two offers at the exact same fare can mean completely different things depending on whether you're buying a bare bones basic economy product or a fully flexible fare with bags. Same price, entirely different competitive situations."[103] That, he said, "is where the ATPCO ecosystem becomes the foundation."[104]

74. ATPCO's own documents describe what airlines do with fare data kept in ATPCO's common terms: they use it to monitor one another and decide whether to respond. ATPCO's 2024 guide for adjusted offers states that airlines use ATPCO fare data "for monitoring competitive activity … and to apply strategies to determine whether to respond to changing activity."[105] Another ATPCO guide for dynamic pricing tells airlines that their fare-management planning must account for "the airline's own fares as well as other airlines' fares for competitive monitoring," and that "[a]n airline may choose to implement proprietary business

---

[103] *Shopping Data for Winning Strategies: Enable Better Competitive Insights*, ATPCO Elevate 2026 (transcript), https://elevate.atpco.net/sessions/shopping-data-for-winning-strategies-enable-better-competitive-insights-d1715 (last visited Nov. 3, 2026) ("ATPCO Elevate 2026 Transcript").

[104] *Id.*

[105] ATPCO, Adjusted Offers: Guidelines for Implementation v1.1 (rev. June 2025), § 9.3, https://prodmedia.atpconet.atpco.net/wp-content/uploads/media/2025/01/03161915/Adjusted Offers_Guidelines-Implementation_v1.1.pdf (last visited Nov. 3, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

rules to automatically respond (match batch) to competitor actions."[106] ATPCO also sold that monitoring to airlines. Its MarketView product invited them to "look into changes that are happening in competitive markets they are targeting, and even set up email alerts for when those changes happen."[107]

75. ATPCO had decided by 2018 where those prices would go: into ATPCO, and not into public fare data. In a September 2018 presentation to an IATA meeting, ATPCO explained that the fares airlines used in dynamic pricing would not appear in the GDSs or in published fare data.[108] Competing airlines, which had read one another's filed fares in ATPCO's data for decades, would not find these fares there, but ATPCO would still have them.

76. Under the standard ATPCO published the next year, the dynamic prices airlines' engines actually offered travelers would be stored in ATPCO. In September 2019, ATPCO announced that its guide to the standard was "now live," and trade press reported that the standard would let airlines send "the adjusted ticket price into the standardized pricing system."[109] Under the guide, an airline reported each adjusted price to ATPCO, either by uploading a fare record or by sending ATPCO a copy of each exchange between its pricing engine and the system that asked it for a price. Each copy showed the baseline fare and the adjusted amount.[110] The request the engine received also carried information about the traveler's

---

[106] ATPCO, Dual RBD Implementation Guide v.3.1 (rev. Mar. 2025), § 5.7.1, https://prodmedia.atpconet.atpco.net/wp-content/uploads/media/2025/01/19153053/dynamic-pricing-dual-rbd_implementation-guide_v3.1c.pdf (last visited Nov. 3, 2026).

[107] Marcelo Franceschini Freire, *Expert's vlog, Part 5 of 5: Save hours a day with four tools for managing your pricing data*, ATPCO Blog (June 16, 2020), https://web.archive.org/web/20251208224800/https://atpco.net/single-blog/experts-vlog-part-5-of-5-save-hours-a-day-with-four-tools-for-managing-your-pricing-data/.

[108] IATA, 5th World Financial Symposium, 7th SIS General Meeting, Sept. 18, 2018), at 25, https://www.iata.org/contentassets/9b1d8d19a6244e4e8cb8c7d7ad3f45e5/atpco_updates.pdf (last visited Nov. 3, 2026).

[109] ATPCO, *ATPCO Reduces Barrier to Entry for Airlines to Adopt Dynamic Pricing* (Sept. 30, 2019), https://atpco.net/single-press/atpco-reduces-barrier-to-entry-for-airlines-to-adopt-dynamic-pricing/ (last visited Nov. 3, 2026); Robert Silk, *ATPCO makes strides in dynamic pricing*, Travel Weekly (Oct. 2, 2019), https://www.travelweekly.com/Travel-News/Airline-News/ATPCO-makes-strides-in-dynamic-pricing (last visited Nov. 3, 2026).

[110] DPE Guide at 12, 38.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

search, which the guide called "who is asking."[111]

77. Under the standard, ATPCO kept a record of adjusted prices whether or not a traveler bought them. The guide had ATPCO check each copy against the ticket-sales data airlines report to it and pass the fares that sold on to the airline's accounting systems. For a fare with no matching sale, the guide provides that "ATPCO will not distribute the fare and will store it for historical/analytical purposes."[112] Revenue accounting is an airline's record of the money it takes in from each ticket. Settlement is the process of paying that money out among the parties to the sale, such as the travel agency that sold the ticket and any other airline that flies part of the trip. Both start with a ticket someone has bought. The guide states that waiting until a ticket is issued "is sufficient to support revenue accounting and settlement requirements."[113] For those purposes, ATPCO needed a fare only once a traveler had paid for it. But ATPCO still kept the offers that no traveler bought.

78. Take two hypothetical travelers on the same flight. Suppose the airline has filed a fare of $299 for their flight. For the first traveler, the airline's engine lowers that fare by $85 and offers $214. For the second, it raises the fare by $62 and offers $361. If the airline reports by sending ATPCO copies of its engine's exchanges, ATPCO receives a record of each offer, showing the $299 fare the engine started from and the adjusted price. The first traveler buys a ticket, and ATPCO passes the $214 sale on for accounting. The second does not, and ATPCO keeps the $361 offer. Based on the process ATPCO developed, both would be recorded at ATPCO in the same terms as every other participating airline's prices.

79. The standard also brought every participating airline's dynamic prices to one place. An airline holds its own dynamic prices, but it has no way to collect its competitors'.[114] Under ATPCO's standard, each participating airline sent its adjusted prices to ATPCO, and

---

[111] *Id.* at 20.

[112] *Id.* § 6.3.2, at 38.

[113] *Id.*

[114] *See supra* ¶ 34, 49.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

ATPCO kept the offers travelers declined along with the ones they bought.[115] A collection of that kind shows the prices at which each airline was prepared to sell, not only the prices at which it sold. Read by more than one airline, it would also give each of them the same picture of the market. As alleged above, a price war can start when an airline cannot tell whether a competitor cut its price or demand simply fell.[116] Economic theory would predict that competitors working from one common record of one another's prices make that mistake less often, and so start fewer of the price wars that bring travelers lower fares.[117]

80. ATPCO also brought more of the airlines' fare data into tools of its own. In November 2020, after what it called "broad consultation with its airline owners," ATPCO launched Architect, a fare-management tool that it said could standardize fare data from multiple sources.[118] Two months later, ATPCO bought Airfare Insight, a product SITA had sold to airlines for detecting competitors' fare changes, and folded it into Architect.[119] The Wittman Dissertation had predicted in 2018 that technology like the fare-monitoring services then sold to airlines would emerge to monitor dynamic prices.[120] By 2024, 27 airlines had signed on to Architect.[121]

81. In October 2022, ATPCO announced a way to bring into its common terms the dynamic prices its earlier standard did not reach. The 2019 standard covered prices an airline's engine set by adjusting a fare already filed with ATPCO.[122] It did not cover offers an airline

[115] *See supra* ¶¶ 71–72.

[116] *See supra* ¶¶ 55, 60, 62.

[117] Wittman Dissertation at 198; *see also supra* ¶¶ 55, 60.

[118] ATPCO Press Release, *ATPCO Unveils Architect* (Nov. 23, 2020), https://atpco.net/press/atpco-unveils-architect-a-powerful-new-pricing-tool-with-icelandair-and-latam-airlines-as-launch-customers/ (last visited Nov. 3, 2026).

[119] ATPCO and SITA Press Release (Jan. 14, 2021), https://atpco.net/single-press/atpco-buys-sitas-airfare-insight-acquisition-expands-atpcos-product-portfolio-and-delivers-efficiencies-to-airlines/ (last visited Nov. 3, 2026).

[120] *See supra* ¶¶ 59–65.

[121] Press Release, *ATPCO Reveals Premier Pricing Tool Architect is the Fastest Growing Decision Support System (DSS) on the Market*, ATPCO (July 23, 2024), https://atpco.net/single-press/atpco-reveals-premier-pricing-tool-architect-is-the-fastest-growing-decision-support-system-dss-on-the-market/ (last visited Nov. 3, 2026).

[122] *See supra* ¶¶ 76–80.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

creates from scratch when a traveler searches, with no filed fare underneath. As Business Travel News explained in reporting ATPCO's commitment, such offers "are generated at the time of search, instead of filed within ATPCO's system."[123] An offer of that kind has no baseline fare in ATPCO's data and cannot be read in ATPCO's terms. Under what ATPCO called airline order posting, the airline would send ATPCO the traveler's order, and ATPCO would convert it "into the current data formats."[124] Once sold, an offer that began outside ATPCO's system would be recorded in ATPCO's terms like any other fare.

82. Order posting also had airlines send ATPCO what each traveler had been offered, in addition to what the traveler bought. With each order, the airline would send its response to the traveler's search, which ATPCO called the "shopping output message."[125] That message lists the offers the airline returned when the traveler searched, including those the traveler passed over.[126] ATPCO announced order posting alongside what it called its "Board-approved roadmap for new standards."[127] The same announcement stated that, under order posting, ATPCO would be "sending only the fares that were actually sold."[128]

83. By 2022, ATPCO's airline board had approved the goal toward which these steps led. In July 2022, ATPCO's chief executive wrote that the goal of building the framework for dynamically created airline offers had been "approved by our board of directors," and that ATPCO would build it "leveraging the data airlines trust us with."[129]

---

[123] Donna M. Airoldi, *ATPCO Commits to 'Dynamic' Airline Offers*, Business Travel News (Oct. 11, 2022), https://www.businesstravelnews.com/Distribution/ATPCO-Commits-to-Dynamic-Airline-Offers (last visited Nov. 3, 2026).

[124] Press Release, *ATPCO Leads Industry Transformation from Static Fare Filing to the Future of Airline Offers; Commits to Move Industry to 80% of All Airline Offers Dynamically Created by 2026*, ATPCO (Oct. 11, 2022), https://atpco.net/single-press/atpco-leads-industry-transformation-from-static-fare-filing-to-the-future-of-airline-offers-commits-to-move-industry-to-80-of-all-airline-offers-dynamically-created-by-2026/ (last visited Nov. 3, 2026).

[125] *Id.*

[126] *See id.*

[127] *Id.*

[128] *Id.*

[129] Alex Zoghlin, *Changing the game for dynamic offers, one innovation at a time*, ATPCO (July 29, 2022), https://web.archive.org/web/20251111101842/https://atpco.net/single-blog/changing-the-game-for-dynamic-offers-one-innovation-at-a-time/ (last visited Nov. 3, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

84. ATPCO's chief commercial officer, Chris Phillips, later described the infrastructure ATPCO had built for reading airline offers, and what it still lacked. ATPCO, he told airlines, had spent "years … building an infrastructure to decode what an offer actually is … beneath the price, down to the atomic construction of the fare."[130] That infrastructure, he said, "is not just a data feed. This is a competitive intelligence infrastructure."[131] But "one critical piece" was still "missing": a view of how the market was responding.[132] "Knowing what you and your competitors have built as offers is foundational, but knowing how the market is actually responding to those offers in near real-time across every channel … that's a different capability entirely. And that's exactly why ATPCO acquired 3Victors."[133] The purpose, he said, was "to close this loop": "3Victors surfaces what's happening in the market at the speed the market demands.[134] ATPCO decodes what it means, and together, for the first time, you have a complete real-time picture of the competitive reality."[135]

**G. ATPCO Created and Administered a Give-To-Get Information Exchange System Where Airlines Pooled Their Confidential Dynamic Pricing Data in a Centralized Location**

85. In June 2023, Gregorson, by then ATPCO's chief strategy officer, published a post titled "The growth of dynamic offers (and pricing) requires an industry solution."[136] Six years earlier, he had led ATPCO's session on dynamic pricing at Elevate 2017.[137] He wrote that airlines had "built very sophisticated processes that understand the prices and products that are in the market," and that without those prices, airline systems "will generate inaccurate forecasts and

---

[130] ATPCO Elevate 2026 Transcript.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] Tom Gregorson, *The Growth of dynamic offers (and pricing) requires an industry solution*, ATPCO (March 9, 2023), https://web.archive.org/web/20260309180336/https://atpco.net/single-blog/the-growth-of-dynamic-offers-and-pricing-requires-an-industry-solution/ (last visited Nov. 3, 2026).

[137] 2017 ATCPO Presentation at slides 1-2.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

price recommendations."[138] The problem, he wrote, was "compounded by the fact that airlines making the inaccurate reactions then impact all other airlines who are forced to react to these prices."[139]

86. The problem the post described is one that each airline in a competitive market ordinarily faces, and handles, on its own. A seller sets its price without knowing exactly what its rivals will charge, and it bears the risk of guessing wrong.[140] An airline that prices too high loses travelers to its rivals, and one that prices too low wins them. In either case, rivals' responses correct the error without any exchange of prices. Take two airlines that each fly the same trip and have each filed a $300 fare for it. (The figures are illustrative.) One airline's pricing engine cannot see the other's prices and offers a traveler $260. To the traveler, what the post calls an "inaccurate reaction" is a lower fare. The second airline loses sales it expected and lowers its own prices in response, which is what the post means by being "forced to react."[141] That uncertainty about rivals' prices is what makes undercutting worth trying.[142] Economists have long identified the difficulty of detecting rivals' price cuts as the main obstacle to coordination among competitors.[143] A solution for the whole industry would give every airline the view of its rivals' prices that each airline lacks on its own.

87. Between 2023 and 2025, ATPCO and its board airlines brought airlines' shopping data, including their dynamically generated prices, into a common pool. ATPCO's subsidiary then offered airlines access to competitors' shopping data in return for their own.

88. ATPCO acted within six weeks of Gregorson's call for an "industry solution." On July 21, 2023, ATPCO announced that its board airlines had approved the first step toward

---

[138] Gregorson, *The Growth of dynamic offers*, supra.

[139] *Id.*

[140] *Id.*

[141] *See supra* ¶ 85.

[142] *See supra* ¶¶ 61–62.

[143] George J. Stigler, *A Theory of Oligopoly*, 72 J. Pol. Econ. 44 (1964), The Univ. of Chicago Press, https://www.journals.uchicago.edu/doi/10.1086/258853 (last visited Nov. 3, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

pooling airlines' shopping data.[144] The announcement described that first step as giving airlines a place to analyze their data together. ATPCO would "provide airlines with access to AWS Clean Rooms to collaborate and analyze their collective datasets."[145] AWS Clean Rooms is a service of Amazon Web Services that lets several companies analyze their combined data under rules the participants set. The release stated that "ATPCO has the support of its 11 board airlines who have approved the first step," and that "multiple airlines" were "already providing their shopping data, including dynamically generated pricing[.]"[146] It gave the reason in ATPCO's words: "airlines need additional data to augment the existing intelligence used to create fares and offers."[147]

89. The data the airlines would analyze together in the ATPCO-administered AWS Clean Rooms was their shopping data, each airline's own record of the searches travelers made and the prices it offered in answer. As ATPCO later explained, the term covers "airline shopping request and response messages from the source where they're generated."[148] The request is the traveler's search. The response is the set of offers the airline returned, each with its price.[149] An airline's shopping data therefore records every price it offered to every traveler who searched, whether or not the traveler bought a ticket.

90. Absent cooperation, a competing airline cannot see that record. Take a traveler who searches for a flight and is offered $214, and a second traveler who searches for the same flight an hour later and is offered $361.[150] Each traveler sees only the price offered to that

---

[144] Press Release, *ATPCO Leverages AWS Clean Rooms to Enable Airline Dynamic Offers Functionality at Scale*, ATPCO (July 21, 2023), https://atpco.net/single-press/atpco-leverages-aws-clean-rooms-to-enable-airline-dynamic-offers-functionality-at-scale/ (last visited Nov. 3, 2026).

[145] *Id.*

[146] *Id.*

[147] *Id.*

[148] Adjusted Offers, *Guidelines for Implementation*, v. 1.1, ATPCO (June 2025), at 9, https://d3i59dyun0two3.cloudfront.net/wp-content/uploads/media/2025/01/03161915/AdjustedOffers_Guidelines-Implementation_v1.1.pdf (last visited Nov. 3, 2026).

[149] *See id.*

[150] *See supra* ¶ 50.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

traveler. A competing airline that wants to know the first airline's prices can search for the same flight itself, by hand or with a program that runs searches automatically. It sees only the price offered in answer to its own search. It does not learn that either traveler searched, or what either was offered. Only the airline and the booking systems that carried the two searches hold that information.[151]

91. In the fall of 2023, ATPCO told airlines how the arrangement would work: airlines that contributed data would receive insights in return. At ATPCO's Focus Summit+ 2023, in a session titled "Dynamic demands: New data types we'll need to support dynamic offers" (the "October 2023 Session"), an ATPCO presenter described the mechanics. ATPCO would invite airlines and other systems to participate, and each participant would set "[a]nalysis rules, what can be accessed, what columns you want to share."[152] Then, he said, "[o]nce the data is in the clean rooms, at this point, ATPCO can do further processing and create the competitive insights and apply models like give-to-get model … where depending on … which airlines and systems are contributing, they get access to the insights … . ."[153]

92. The same presenter showed a concept for what a contributing airline would see. "We summarize this data and created something called 'price ladder,'" he said. "[I]n this price ladder, each one of the price points you would be able to see how many competitors are there, as well as who the competitors are."[154] The ladder was "especially to fill the gap into competitive insights. Especially where dynamically adjusted prices and dynamic offers are in the market."[155]

93. The arrangement answered a demand that ATPCO attributed to the airlines themselves. Daphne Nothwehr, a senior product strategy manager at ATPCO, had opened the October 2023 Session by stating it: "[F]rom a competitive data standpoint, airlines need and they

---

[151] *See supra* ¶ 51.

[152] ATPCOnews, Focus Summit+ 2023: *Dynamic demands: New data types we'll need to support dynamic offers*, YouTube (video posted Oct. 30, 2023), at 22:25–23:45, https://www.youtube.com/watch?v=bm2FK5Qn4Rk (last visited Nov. 3, 2026) ("Oct. 2023 Session").

[153] *Id.*

[154] *Id.* at 15:12-16:02.

[155] *Id.*


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

want to have a complete view of their own prices alongside their competitor prices in the marketplace."[156]

94. ATPCO said that several airlines, including major North American airlines, were already taking part in the pilot as part of the arrangement. Gregorson described it as a pilot ATPCO was running "right now with several airlines using AWS Clean Rooms."[157] Another ATPCO presenter said ATPCO had begun working with "some major airlines in Northern America."[158] According to ATPCO, one partner airline alone generated "around 7 terabytes of data per day" of shopping data.[159]

95. Earlier in the same session, Nothwehr also explained to the audience that ATPCO had brought in the researcher at the center of the work described above – Peter Belobaba, the first-listed author of the PODS Study discussed above and the supervisor of the Wittman Dissertation – to again advise it. Nothwehr told the audience that ATPCO had "recently had industry expert Dr. Peter Belobaba in to work with us," and that in a recent ATPCO webinar, Belobaba told the company:[160]

> The "Holy Grail" is to get the dynamic price and product determination based on more contextual information, which will require more data and more detailed market information... . [S]ignificant improvements are needed to current data sources that will be required to enable forecasting and optimization models and improve revenue management for the future that will drive us to more dynamic offers… . [W]e simply just don't have the data we need. So, new data sources will be required.[161]

96. Belobaba, Nothwehr said, "specifically called out a need for improved competitive data and the potential for shopping data"—precisely what the clean rooms program

---

[156] *Id.*

[157] ATPCO, Focus Summit+ 2023, *State of the Industry Update*, at 20:50, YouTube (video posted Oct. 30, 2023) https://www.youtube.com/watch?v=_Sd2BGSFSqA (last visited Nov. 3, 2026) ("Oct. 2023 State of the Industry Update").

[158] Oct. 2023 Session, at 24:12.

[159] *Id.* at 14:15.

[160] *Id.* at 3:56.

[161] *Id.* at 4:38–5:16.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

was designed to collect:[162]







[162] *Id.* at 5:16–5:24.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

97. On November 1, 2023, ATPCO's chief executive described the program to an industry audience as a way for airlines to see what their competitors were doing.[163] He spoke at the Skift Aviation Forum in Fort Worth, Texas, in a session presented by Amazon Web Services.[164] He began with the problem dynamic pricing posed. United, a member of ATPCO's board, was pricing dynamically in real time, and airlines "now have to respond … to an airline that you don't know what their pricing is anymore."[165] Most airlines, he said, were "getting a feed once a day" of competitors' fares, from ATPCO or other companies. Basing pricing decisions on that feed, when a competitor's prices change with each search, was "not going to work."[166]

98. So, he said, ATPCO had "entered into a program because we're airline-owned."[167] Under "what we call a give to get model," airlines "send their shopping data, which is now dynamically generated, into … clean rooms," where ATPCO "can help them mesh it."[168] In that way, he said, "we continue what we call a transparent market so you can see what your competitors are up to, your competitors can see what you are up to and pricing can maintain at least the transparency that both customers and airlines and their revenue systems are used to doing."[169] He went on to explain why the data had to be centralized:[170]

> In the old ATPCO world we would distribute this data. We still do distribute this data. When [pricing] starts to go dynamic, that data set is so big, ten terabytes per carrier multiplied by the 450 in our system, you're talking about petabytes of data that's generated in a single day. You have to flip the paradigm. Only companies like Amazon are capable of managing that size of data. So we're now

[163] Skift, *Why Leading Airlines Are Focused on Data*, YouTube (video uploaded Nov. 7, 2023), https://www.youtube.com/watch?v=eE42kcj4AEU (last visited Nov. 3, 2026) ("Skift Session"); Brian Quinn, *Don't Miss Skift Aviation Forum on Nov. 1 in Fort Worth, TX*, Skift (Oct. 20, 2023), https://skift.com/2023/10/20/dont-miss-skift-aviation-forum-on-november-1-in-fort-worth-tx/ (last visited Nov. 3, 2026).

[164] *Id.*

[165] *Id.* at 05:43.

[166] *Id.* at 06:44–08:26.

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] *Id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

> asking carriers: instead of us distributing the data to you, bring your compute to us and the data can sit in one place and we don't have to replicate it.

99. "Having one company that's utility owned by the industry that can manage it," he concluded, "is really what's going to help all of us long term."[171]

100. What the chief executive described is the arrangement ATPCO's research had identified in 2017 and 2018 as the remedy for price wars. An airline that cuts its price where rivals cannot see the cut wins travelers before the rivals can respond, and that prospect is what makes cutting worth trying.[172] Each rival has the same reason to cut back, and in ATPCO's 2017 illustration, two airlines answered each other a dollar at a time until one reached marginal cost.[173] When each airline can see the others' prices, a cut is seen and matched, and the airline that cut gains little from it.[174] Six years after ATPCO's slide named improved pricing data as the remedy for a price war, ATPCO was building a program to give airlines that data about one another. In its chief executive's words, under the program "you can see what your competitors [are] up to, [and] your [competitor] can see what you are up to."[175]

101. In December 2023, ATPCO bought 3Victors, Inc. ("3Victors") and made the shopping-data program part of a company it owned.[176] ATPCO's announcement presented the purchase as the next step in the clean-rooms program: "This acquisition follows the recent announcement that ATPCO is leveraging AWS Clean Rooms to enable ATPCO and participating airlines to analyze their collective shopping insights."[177] ATPCO's chief executive explained that as airlines moved to dynamic offers, "there will be a gap in the current data to

---

[171] *Id.*

[172] *See supra* ¶ 57.

[173] *See supra* ¶¶ 55–56.

[174] *See supra* ¶ 57.

[175] Skift Session at 06:44–08:26.

[176] Press Release, *Airline Data Powerhouse ATPCO Buys Data Intelligence Platform 3Victors*, ATPCO (Dec. 5, 2023), https://atpco.net/single-press/airline-data-powerhouse-atpco-buys-data-intelligence-platform-3victors/ (last visited Nov. 3, 2026).

[177] *Id.*


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

maintain accurate pricing."[178]

102. The purchase added 3Victors' own data to the program. 3Victors would supply "a real-time response of industry travel demand while supplementing fares not currently filed through ATPCO."[179] It already collected airline shopping data in large volume. By 2019, it reported ingesting "over 1 billion worldwide travel searches and 200 billion itineraries in real-time DAILY."[180] According to a consultant's report on the deal that ATPCO posted on its website, 3Victors' information "feeds in to airline pricing and revenue management systems."[181]

103. Within months, 3Victors was running the shopping-data program inside ATPCO. In January 2024, ATPCO's chief executive wrote that the acquisition "will position ATPCO as the industry's leading source of competitive airline pricing and shopping data."[182] In April 2024, at ATPCO's Elevate + TravelConnect conference, Nothwehr returned to the work she and her colleagues had described in October 2023. She recalled that "at our last conference, we highlighted some of the data experiments that ATPCO had been working on," including "discovery work we're doing with the AWS Clean Rooms."[183] She then told the airlines that 3Victors had taken over the trials ATPCO had been running with airlines' shopping data. In industry usage, such a trial is called a proof of concept: a small-scale test, run with a few early

---

[178] *Id.*

[179] *Id.*

[180] Rick Seaney, *A Travel Tech CEO's Journey from cloud skeptic to evangelist*, AWS for Industries (Oct. 11, 2019), https://aws.amazon.com/blogs/industries/a-tech-ceos-journey-from-cloud-skeptic-to-evangelist/ (last visited Nov. 3, 2026).

[181] *See* T2RL, *First View: ATPCO accelerates its Transformation with 3Victors* (Dec. 2023), https://web.archive.org/web/20240611045616/https://www.atpco.net/sites/atpco-public/files/all_pdfs/t2rl-first-view-atpco-accelerates-its-transformation-with-3victors.pdf (last visited Nov. 3, 2026); Richard Clark, *T2RL's guest blog: ATPCO accelerates its transformation with 3Victors*, ATPCO (Feb. 26, 2024), https://web.archive.org/web/20251111115207/https://atpco.net/single-blog/t2rls-guest-blog-atpco-accelerates-its-transformation-with-3victors/ (last visited Nov. 3, 2026).

[182] Alex Zoghlin, *A year of acceleration and innovation*, ATPCO (Jan. 10, 2024), https://web.archive.org/web/20260217021142/https://atpco.net/single-blog/a-year-of-acceleration-and-innovation/ (last visited Nov. 3, 2026).

[183] ATPCOnews, *Elevate + TravelConnect: Date meets AI: Key characters in the airline industry*, YouTube (May, 30 2024), at 35:06–35:40, https://www.youtube.com/watch?v=U-jP5T0DdG8 (last visited Nov. 3, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

participants, of whether a product works before it is offered more widely.[184] In her words, 3Victors was now "driving primarily the shopping data POCs that we had going on."[185]

104. By 2024, ATPCO's leaders were presenting 3Victors to airlines as the way to see themselves against their competitors. At ATPCO's Focus Summit+ 2024 in Istanbul, ATPCO's chief executive said that "we have things like 3Victors that allows you to compare what you look like in the market to your competitive set."[186] The president of ATPCO's core business asked the audience: "Why are we all doing those efforts independently with holes in the data, with blinders on … and doing it just looking at our own data?"[187] ATPCO's chief commercial officer also spoke. "[I]n the new world where I have fragmented content and I'm changing my fares dynamically or continuously," he said, 3Victors helps "identify for airlines and distribution channels … what is actually available in the market right now on a real-time basis. How's it look on a competitive basis to other players in the market?"[188]

105. The next month, ATPCO carried forward the shopping-data program that had begun in the AWS clean rooms into an initiative it called Iris. ATPCO's chief commercial officer introduced Iris on 3Victors' website as "the industry's only AI powered shopping data repository."[189] He reported that airline participation "has increased by more than 5X this year," with a "growing pipeline of airlines engaged in connecting with our network."[190] Eight months earlier, ATPCO had told airlines that 3Victors was running the shopping-data trials ATPCO had

---

[184] *Id.*

[185] *Id.* at 35:40-35:53.

[186] ATPCOnews, A welcome by ATPCO President and CEO, Alex Zoghlin, YouTube (video posted Nov. 19, 2024), at 06:01, https://www.youtube.com/watch?v=b7WfwovQeds (last visited Nov. 3, 2026).

[187] ATPCOnews, *Data Innovation: The Key to Unlocking Competitive Advantage*, YouTube, at 14:57–16:09 (Nov. 19, 2024), https://www.youtube.com/watch?v=8ZrsRp7Y1io.

[188] ATPCOnews, *AI's Revolution in Competitive Intelligence: Maximizing Impact While Managing Risks*, YouTube, at 21:04–21:39 (Nov. 19, 2024), https://www.youtube.com/watch?v=iuievR56M54.

[189] Chris Phillips, *Reflecting on 2024: A year of innovation and milestones for 3Victors*, 3Victors (Dec. 13, 2024), https://www.3victors.com/blog/reflecting-on-2024-a-year-of-innovation-and-milestones-for-3victors (last visited Nov. 3, 2026).

[190] *Id.*


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

begun in the clean rooms.[191] Iris collects the same kind of data the clean rooms did, airlines' dynamically generated shopping data, and makes it available on the give-to-get terms ATPCO had described in 2023.[192]

106. In April 2025, 3Victors' co-founder described Iris as "an airline-owned shopping data repository that delivers complete, timely, and accurate real-time competitive data."[193] He presented Iris as the alternative to scraping competitors' websites: "Instead of playing defense by blocking bots while trying to scrape competitors, airlines that contribute to Iris receive enriched competitive shopping data."[194]

### H. ATPCO Created Iris as a Repository of Confidential Airline Pricing Information that Operates on a Give-To-Get Basis

107. Iris collects airlines' own shopping data, including records no competitor could otherwise see, and returns competitors' data to each contributing airline in proportion to what it contributes. 3Victors' website says that Iris is not "just a data repository" but "a strategic advantage"[195] and (in recently modified language) states that Iris combines "proprietary, partner, and participant-based data into a single standardized stream of flight shopping data"[196]:

---

[191] *See supra* ¶ 103.

[192] *See supra* ¶¶ 91, 94, 98, 101.

[193] Rick Seaney, *AI agents and airline shopping: 2025's big disruption*, 3Victors (Apr. 23, 2025), https://www.3victors.com/blog/ai-agents-airline-shopping-2025-big-disruption (last visited Nov. 3, 2026).

[194] *Id.*

[195] Data, 3Victors, https://www.3victors.com/data (last visited Nov. 3, 2026).

[196] This language was previously available on 3Victors' website as recently as October 4, 2026, but has since been deleted. *See* https://web.archive.org/web/20261004074310/https://www.3victors.com/data (last visited Nov. 3, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX






**Data sources:** Global reach, full visibility

3Victors combines proprietary, partner, and participant-based data into a single standardized stream of flight shopping data. Sources include:

**Monitor**
Direct airline APIs—Shopping data sourced directly from airline systems

**Analyze**
Streaming data feeds—Continuous shopping data from carrier platforms and partners

**Analyze**
GDS EDIFACT—High-coverage content from traditional distribution systems

**Analyze**
OTA & metasearch APIs—Price points from where consumers turn to comparison shop

**Analyze**
Web scraping—Strategically applied data to fill coverage gaps

108. 3Victors, which describes itself as "an ATPCO company," sets out how Iris works in a white paper titled "The competitive intelligence crisis" (the "3Victors White Paper").[197] Iris gave airlines back the view of one another's prices that filed fares had once provided. For decades, every airline's fares sat in ATPCO's data, where every competitor could read them and decide whether to respond. Dynamic prices did not appear in that data. The 3Victors White Paper

[197] 3Victors, *The Competitive Intelligence Crisis: Why Dynamic Offers and AI Agents Demand a New Approach*, https://www.3victors.com/shopping-data (last visited Nov. 3, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

addresses airlines that had lost the view. It quotes an American executive: "Understanding the lowest selling fare is no longer enough."[198] An Air Canada executive explains that "the price will likely change more frequently with the rise of continuous and other dynamic pricing," and that "that is going to require a new type of data exchange."[199]

109. Airlines had tried to fill the gap with scraping: programs that search airline and travel websites the way a traveler would and record the prices displayed. A scraper sees only what any traveler could see, one search at a time. The paper states that "the currently popular practice of web scraping to gather competitive information is unsustainable," that it leaves airlines "unable to get a full picture of competitive offers," and that it "delay[s] competitive insights by days."[200]

110. The paper offers Iris as the answer: "an industry-neutral, cost-effective shopping data repository."[201] It explains why airlines should contribute in five words: "Dynamic pricing demands dynamic data."[202]

---

[198] 3Victors White Paper at 8.

[199] *Id.* at 7.

[200] *Id.* at 7.

[201] *Id.* at 9.

[202] Data, 3Victors, https://www.3victors.com/data (last visited Nov. 3, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX




111. Iris receives more than filed fares ever shown. A filed fare was a single price, available to every traveler. The 3Victors White Paper defines shopping data as "time-stamped flight search and results data generated whenever a shopping request occurs and a system returns offers for air travel."[203] The data includes the traveler's "search request" as well as the "detailed offer response." Together they record the dates and times of travel, the airlines and flight numbers, the cabin, the number of passengers, and each fare with its taxes, fees, and surcharges, among other details.[204] Iris takes in every offer the airline returned, not only the one the traveler saw: "Iris data contains all offers returned from a shopping request, including all brands, cabins, and price points, unlike web-scraping techniques that most often pull the limited offer content presented to customers, typically at the lowest available price."[205]

---

[203] 3Victors White Paper at 10.

[204] *Id.*

[205] *Id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

112. The offers Iris collects from airlines' own systems include the airlines' dynamic prices. A dynamic price exists only as the price an airline's system returns when a traveler searches. It appears nowhere except in the airline's response to that search. According to the 3Victors White Paper, "Iris data is sourced directly from airline and GDS calls."[206] 3Victors' website lists (in the same now-deleted language above) among Iris's sources "[s]hopping data sourced directly from airline systems" and "[c]ontinuous shopping data from carrier platforms and partners," with web scraping used to fill gaps.[207] 3Victors head of business development said that "[p]rimarily, we're interacting with streaming content coming directly from airlines themselves."[208]

113. Unlike a filed fare, most of what Iris receives was never public. That includes the searches themselves and each airline's responses to them, with the dynamic prices that appear nowhere else. Only the traveler who searched saw the prices returned to that search; a competitor searching the same flight sees only the prices returned to its own. Iris takes in every offer the airline returned, not only the ones the traveler saw: "Iris data contains all offers returned from a shopping request, including all brands, cabins, and price points, unlike web-scraping techniques that most often pull the limited offer content presented to customers, typically at the lowest available price."[209] Indeed, airlines try to deny their rivals even the limited view a scraper gets: according to 3Victors, airline websites "typically block" bots "to prevent competitors from web scraping their shopping data," and "[m]any airlines employ web scraping where they can but also have controls in place to limit web scraping on their own site."[210]

114. Iris gives an airline its competitors' data only if the airline contributes its own, and in proportion to what it contributes. The 3Victors White Paper states that "[b]y contributing

---

[206] *Id.*

[207] *See* https://web.archive.org/web/20261004074310/https://www.3victors.com/data, *supra.*

[208] 3Victors, Webinar: Exploring the New PriceEye Dashboard, at 8:53–8:59 (July 31, 2025), https://www.3victors.com/webinar-on-demand---exploring-the-new-priceeye-dashboard (remarks of Stan Barnes, Head of Business Development, 3Victors) (video also available at https://player.vimeo.com/video/1108715636?h=1e8bd49252) ("New PriceEye Dashboard").

[209] 3Victors White Paper at 10.

[210] *Id.* at 6, 7.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

their own shopping data, participants will be able to receive competitive data at higher volume, velocity, and variety," and that "[p]articipants receive shopping data commensurate with the participating airlines, volume, velocity and comprehensiveness of the data they provide."[211] Its diagram of "How Iris works" is labeled "Must Contribute," "Full Content," and "Full Network," with arrows marked "Contribute" and "Receive."[212]




[211] 3Victors White Paper at 9.

[212] *Id.* at 9.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

115. 3Victors' website states the rule more simply: "Participation in Iris is based on a simple principle: the more you contribute, the more you receive."[213]




116. The 1994 Decree had tied what an airline could learn about its competitors through ATPCO to what the public could see. ATPCO could pass along only fares actually for sale. It could not show an airline a competitor's fare change before sending that change to the systems travel agents used. It could not give an airline information about its rivals' fares that the travel agents selling those fares did not also have. Iris ties what an airline learns to what the airline contributes. A contributing airline receives its competitors' searches and offers, including every offer an airline's system returned, which is more broad than "the limited offer content presented to customers."[214]

117. Iris also delivers the data while it is current. The 3Victors White Paper states that shopping data "is collected throughout the day, enabling multiple daily feeds and eliminating the need to perform web scraping in a small shopping window of the day and providing real-time market intelligence to inform airline decision making."[215]

---

[213] 3Victors, *Data*, https://www.3victors.com/data (last visited Nov. 3, 2026).

[214] 3Victors White Paper at 10.

[215] *Id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

118. 3Victors sells PriceEye, a product that shows an airline its competitors' fares, pricing changes, and future pricing and availability. PriceEye, it says, lets airlines move "from making decisions based on hours-old scraped data to the real-time AI-powered analytics necessary to take full advantage of dynamically generated offers."[216] 3Victors' website promises contributors insight "hour by hour, not day by day."[217] In the years before the 1992 Action, according to DOJ, the airlines used ATPCO's data to produce "detailed daily reports" of their competitors' fare changes.[218]

119. Speed matters because an airline that undercuts a rival keeps the travelers it wins only until the rival learns of the cut and matches it.[219] If the rival learns of the cut days later, from scraped data, the airline that cut keeps those travelers for days. If the rival learns within hours, the gain lasts hours, and the cut is hardly worth making. The economic research the Wittman Dissertation relied on predicts that the more clearly firms can see one another's price cuts, the less often price wars start.[220] In ATPCO's 2017 illustration, each airline answered the other's last cut.[221] Iris shortens the time between a competitor's cut and the moment an airline can see and respond to it.

120. ATPCO markets PriceEye for exactly this purpose. In 2026, its chief commercial officer described the scenario PriceEye addresses: "Something shifts in the market. A competitor moves. Your analysts know something's changed, but finding it, understanding it, and acting on it can take hours and sometimes even days." With PriceEye, he said, "competitive shifts surface automatically," and the airline is "pointed directly to what's changed and what it means in minutes, not in days. Every hour of lag is an hour of missed opportunity. PriceEye eliminates

---

[216] *Id.* at 11.

[217] Data, 3Victors, https://www.3victors.com/data (last visited Nov. 3, 2026) ("Why contribute?" tab).

[218] *See supra* ¶ 32.

[219] *See supra* ¶ 57.

[220] *See supra* ¶ 62.

[221] *See supra* ¶ 55.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

that lag."[222]

**I. ATPCO Provides Pooled Data to Each Participating Airline Through Its PriceEye Product.**

121. Airlines receive Iris data through PriceEye, 3Victors' product for monitoring competitors' prices. 3Victors offers Iris data to "PriceEye customers that contribute shopping data to Iris."[223] ATPCO describes PriceEye as "3Victors' pricing intelligence solution built on Iris shopping data."[224] PriceEye predates Iris. Alaska had signed on to PriceEye by July 2024, before Iris was introduced. Once Iris existed, the airlines buying PriceEye could contribute their own shopping data and receive their competitors' in return.[225]

122. PriceEye delivers competitors' prices to each airline in two ways: as a data feed into the airline's own systems and, since July 2025, through a dashboard built on that same data. In the words of 3Victors' head of business development, the customer's "input file contains the instructions about what information you seek for us to collect on your behalf. So, that would be inclusion of which competitors … ."[226]




[222] ATPCO Elevate 2026 Transcript.

[223] Data, 3Victors, https://www.3victors.com/data (last visited Nov. 3, 2026) ("Iris Flight Shopping Data" tab).

[224] *Seeing the Market Clearly with PriceEye*, ATPCO Elevate 2026, https://elevate.atpco.net/sessions/seeing-the-market-clearly-with-priceeye (last visited Nov. 3, 2026).

[225] *See supra* ¶ 108.

[226] New PriceEye Dashboard at 7:52–8:21.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

123. 3Victors' diagram of "How PriceEye works" shows the customer's input file and Iris feeding PriceEye. PriceEye filters the data, including by carrier, and delivers it to the airline's own systems. The diagram states that "[e]verything here is configurable down to the customer/profile level." Most PriceEye customers ingest this data directly into their own systems. As 3Victors' head of business development explained, "[m]ost of our customers are receiving data directly into their systems or their endpoints. Typically, that's conducted through an S3 or an SFTP environment."[227]

124. Before the data reaches customers, PriceEye cleans it and supplements competitors' offers with fare information in the terms ATPCO uses for filed fares. 3Victors' diagram shows each offer being supplemented with its taxes, its fare basis code (the code that identifies a filed fare and its rules), its booking class, and its brand. Booking class, brand, and fare rules are the details ATPCO's standards attach to each filed fare and to each dynamic price recorded under them.[228] In 2026, ATPCO's video explaining PriceEye stated that it uses "industry data enriched with brands, taxes, and fare rules from ATPCO."[229]

125. PriceEye's dashboard adds views built for comparison, showing each airline its competitors' prices, competitor by competitor, for travel dates still to come.[230] A 3Victors product manager described a PriceEye view that "is using the lowest price per day per carrier."[231] In now-deleted language on its webpage, PriceEye invites airlines to "[v]iew future pricing and availability to identify competitive gaps, optimize positioning, and act before competitors do"[232]:

[227] New PriceEye Dashboard at 11:53–12:07. S3 (Amazon's cloud file-storage service) and SFTP (a secure protocol for transferring files between computers) are standard ways of delivering data files automatically into a company's own storage.

[228] *See supra* ¶¶ 71–72.

[229] ATPCOnews, *How 3Victors' PriceEye Works*, YouTube, at 2:04–2:13 (Oct. 5, 2026), https://www.youtube.com/watch?v=xaL7lEk4Y28 (last visited Nov. 3, 2026).

[230] *See supra* ¶¶ 117, 120.

[231] New PriceEye Dashboard at 27:52–28:02.

[232] This language was previously available on 3Victors' website as recently as October 4, 2026, but has since been deleted. *See* https://web.archive.org/web/20261004074310/https://www.3victors.com/priceeye.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX




126. 3Victors' "Price Outlook" screens show competitors' prices for future departure dates.[233]

---

[233] New PriceEye Dashboard at 27:29–27:57.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX







127. PriceEye is built to find instances in which a competitor has offered a lower price. 3Victors lists "[m]arket undercuts and overpricing" among what PriceEye shows.[234] When the dashboard launched, a trade publication reported that it let pricing teams "uncover instances where competitors offered lower fares."[235] In 2026, ATPCO's video showed PriceEye telling an

[234] PriceEye, 3Victors, https://www.3victors.com/priceeye (last visited Nov. 3, 2026) ("How PriceEye works" section, "Insights" tab).

[235] Melinda Healy, *3Victors Launches PriceEye Dashboard*, Travolution (July 2, 2025), https://www.travolution.com/en/article/3victors-launches-priceeye-dashboard (last visited Nov. 3, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

airline that "your discount buckets are closed while your competitor is still selling from lower ones," meaning that the airline had stopped selling its lower fares while a competitor had not.[236] In 2018, the Wittman Dissertation had described what filed fares let airlines do: "perfectly monitor when their competitors make pricing changes and react accordingly, including the possibility of responding with fare wars or punishments when undercutting is detected."[237] PriceEye now offers the same functionality for airlines.

### J. Public Sources Indicate that Alaska, Jetblue, Southwest, United, and American Use 3Victors

128. ATPCO and 3Victors have not published a list of the airlines that buy PriceEye or contribute to Iris. What they have said publicly is that the number keeps growing. In December 2024, 3Victors reported, in an announcement introducing Iris, that airline participation "has increased by more than 5X this year with a growing pipeline of airlines engaged in connecting with our network," adding that "[o]ur commitment to data timeliness, accuracy, and transparency has made PriceEye a critical tool for airlines seeking real-time competitive intelligence."[238] A year later, 3Victors' year-end review reported that "[i]n 2025, another major global network carrier went live with PriceEye and Iris with many more entering trial periods," adding: "[a]s we scale, we're inviting more airlines to join the 3Victors community."[239]

129. Today, ATPCO, which says it serves 457 airlines, offers PriceEye as part of its "market-analysis subscriptions" under the heading "PriceEye for competitive market visibility," advertising that PriceEye allows a user to "[u]nderstand how your airline's offers are positioned in the market with AI-powered insights into competitive pricing to help you monitor, compare,

---

[236] ATPCOnews, *How 3Victors' PriceEye Works*, YouTube, at 1:27-1:38 (Oct. 5, 2026), https://www.youtube.com/watch?v=xaL7lEk4Y28 (last visited Nov. 3, 2026).

[237] Wittman Dissertation at 184.

[238] Chris Phillips, *Reflecting on 2024: A Year of Innovation and Milestones for 3Victors*, 3Victors Blog (Dec. 13, 2024), https://www.3victors.com/blog/reflecting-on-2024-a-year-of-innovation-and-milestones-for-3victors (last visited Nov. 3, 2026).

[239] Will Linderman, *2025 Year in Review: Powering Smarter Airline Decisions with Data, Insights, and Innovation*, 3Victors Blog (Dec. 16, 2025), https://www.3victors.com/blog/2025-year-in-review-powering-smarter-airline-decisions-with-data-insights-and-innovation (last visited Nov. 3, 2026).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

and respond with greater precision."[240]

130. Public statements by ATPCO, 3Victors, and the airlines themselves identify at least five of the Airline Defendants as 3Victors users and underscore the usefulness of the information exchange it facilitates.

131. **Jetblue.** JetBlue's venture-capital arm, JetBlue Technology Ventures, invested in 3Victors in early 2020, several years before ATPCO bought the company.[241] Since at least June 2024, JetBlue's logo has appeared on 3Victors' website among the "leading travel industry organizations [that] trust 3victors."[242]

132. Most recently, when ATPCO wanted to show the industry what its shopping data could do, it put JetBlue on stage. At ATPCO's 2026 Elevate conference, ATPCO's chief commercial officer, Chris Phillips, introduced JetBlue's Senior Manager of Revenue Management Data Science, Nick Mirza, as "someone who's already living this experience," thanking him for "being our guinea pig on this data journey."[243] Asked to describe "the moment [his] team realized that the traditional competitive data wasn't enough anymore," Mirza explained that, while competitive data is "extremely powerful," it is not "helpful" if JetBlue does not "trust" it, and that JetBlue wanted "a platform and a provider that could get us the data with reliability and the right context and features."[244] With reliable data, Mirza stated, JetBlue can look at a competitor's fare and be satisfied it is real, explaining that it allows him to answer the question: "Is that really the fare?" Once he concludes something is not a "measurement error" resulting from "inaccuracies" or "gaps" "in the data," Mirza explained, it "makes it much easier

---

[240] About ATPCO, *The foundation of modern airline retailing*, ATPCO, https://atpco.net/about (last visited Nov. 3, 2026); Market Analysis Subscriptions, *Power smarter, faster market insights*, ATPCO, https://atpco.net/market-analysis-subscriptions/ (last visited Nov. 3, 2026).

[241] Bonny Simi, *2020 Year in Review*, SKY VC (Dec. 17, 2020), https://www.sky-vc.com/blog/2020-year-in-review (last visited Nov. 3, 2026). In 2025, SKY Leasing acquired JetBlue Ventures and subsequently rebranded it SKY VC. JetBlue, *Sky Leasing Announces Acquisition of JetBlue Ventures* (May 5, 2025), https://ir.jetblue.com/news/news-details/2025/SKY-Leasing-Announces-Acquisition-of-JetBlue-Ventures/default.aspx (last visited Nov. 3, 2026).

[242] *See* Capture of 3Victors homepage as of June 22, 2024, https://web.archive.org/web/20240622170253/https://www.3victors.com/ (last visited Nov. 3, 2026).

[243] ATPCO Elevate 2026 Transcript.

[244] *Id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

to sort of call a shot and use those data to help inform my own strategy."[245]

133. Mirza went on to describe how data can change a decision: an analyst has a "light bulb moment" where, for example, she sees something in JetBlue's "[revenue management] signals," checks the "shopping data," then realizes how "it all made sense … that I was missing this bit of context. I was missing this signal. And here's how it helped me come up with a new decision."

134. **Alaska.** On July 11, 2024, 3Victors announced that Alaska had "partnered with the company for its PriceEye solution to supply competitive fare content to [Alaska]."[246] Alaska's Director of Revenue Management, Dante West, explained the decision: "After a successful proof of concept, we found that 3Victors' PriceEye is a perfect fit for our competitive fare content needs," explaining that "[t]he quality, completeness, and timely delivery of the data ha[d] been impressive to see" and that Alaska was "excited to work more closely with the 3Victors team."[247] The release also described Alaska as "a key user of ATPCO's other top products such as its pricing management tool Architect and its merchandising solution Routehappy … [that] saw the synergies of employing 3Victors data products."[248] Shortly afterwards, in September 2024, Alaska Air Group completed its acquisition of Hawaiian, whose chief revenue officer had sat on the ATPCO board that approved the clean-rooms program.[249]

135. **Southwest.** On April 22, 2026, Andrew Hoefler, Southwest's Senior Manager of Pricing Strategy, presented a session titled "Seeing the market clearly with PriceEye" alongside a 3Victors data scientist and ATPCO's regional director for Asia-Pacific. ATPCO's description of the session called PriceEye "3Victors' pricing intelligence solution built on Iris shopping data"

---

[245] *Id.*

[246] Press Release, 3Victors, *Alaska Airlines Signs PriceEye Deal with 3Victors* (July 11, 2024), https://www.3victors.com/post/alaska-airlines-signs-priceeye-deal-with-3victors (last visited Nov. 3, 2026).

[247] *Id.*

[248] *Id.*

[249] Press Release, *ATPCO Announces New Chairperson of the Board*, ATPCO (Apr. 3, 2023), https://atpco.net/single-press/atpco-announces-new-chairperson-of-the-board/ (last visited Nov. 3, 2026) (listing "Brent Overbeek, SVP Chief Revenue Officer, Hawaiian Airlines").


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

that "helps airlines monitor market shifts and respond faster," and advertised: "Get the inside scoop on how real-time, cross-channel pricing visibility and actionable insights empower teams to optimize pricing, stay ahead of AI-driven search, and make confident, data-driven decisions."[250]

136. **United.** United's vice president of pricing and revenue management, Dave Bartels, sat on the ATPCO board that approved the clean-rooms program.[251] ATPCO's website announced a November 27, 2023 session at re:Invent, the annual conference of Amazon Web Services, titled "Unlock Customer Value Securely with Clean Room Data Collaboration for Industries." The session would feature "speakers from ATPCO, an airline retail platform, and their customer, United Airlines, on how they are experimenting together to overcome current business challenges and improve customer value."[252]At the time, ATPCO was telling the industry it had "already started collaborating with some major airlines in Northern America" on clean rooms.[253]

137. In April 2025, at ATPCO's Elevate conference in Chicago, the only airline represented on a panel titled "AI and competitive intelligence" was United. Specifically, Kevin Wang, a senior data scientist, appeared alongside 3Victors' vice president of innovation, Rick Seaney, as well as Amazon Web Services' Global Head of Travel Massimo Morin, who has previously appeared alongside senior ATPCO personnel in discussing ATPCO's clean rooms program.[254] In response to a question about whether artificial intelligence was "helping airlines"

---

[250] *Seeing the Market Clearly with PriceEye*, ATPCO Elevate 2026, https://elevate.atpco.net/sessions/seeing-the-market-clearly-with-priceeye (last visited Nov. 3, 2026).

[251] *ATPCO Announces New Chairperson of the Board*, *supra* (listing "Dave Bartels, VP Pricing and Revenue Management, United Airlines").

[252] ATPCO, AWS re:Invent 2023, https://www.atpco.net/events/aws-reinvent-2023 (last visited Nov. 2, 2026) (session titled "Unlock Customer Value Securely with Clean Room Data Collaboration for Industries," Nov. 27, 2023); *see also* https://web.archive.org/web/20231205114254/https://www.atpco.net/events/aws-reinvent-2023 (capture of Dec. 5, 2023).

[253] ATPCOnews, *Focus Summit+ 2023: Dynamic Demands: New Data Types We'll Need to Support Dynamic Offers*, YouTube (Oct. 30, 2023), at 24:00-24:20, https://www.youtube.com/watch?v=bm2FK5Qn4Rk (last visited Nov. 3, 2026).

[254] *See* Skift Session (panel with Massimo Morin, Global Head of Travel, Amazon Web Services, and Alex Zoghlin, then-President and CEO of ATPCO).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

discover "new products they can sell," Wang responded that "[e]verything starts with data," adding that "data providers like [3Victors] also help us with competitively what is happening in the marketplace."[255]

138. Notably, Wang did his graduate research at MIT under Peter Belobaba, the PODS Study's first-listed author, with financial support from the MIT PODS Consortium, whose funders included United and ATPCO. That research studied the problem this exchange addresses: Wang's 2020 thesis simulated four competing airlines and found that when one priced dynamically, most of its gain was "attributable to undercutting the existing fares" of the others.[256]

139. **American.** American is one of ATPCO's board airlines and one of its owners. Its vice president of revenue management sat on the board that approved the clean-rooms program.[257] Since June 2024, American's logo has appeared on 3Victors' website among the "leading travel industry organizations [that] trust 3victors."[258] 3Victors has also featured quotes from American Airlines in its public relations material. As discussed above, in a white paper discussing the "competitive intelligence crisis" in the airline industry, 3Victors quotes Becky Gross of American Airlines as stating: "As airline selling processes evolve with channel differentiation and continuous pricing, it becomes increasingly challenging to understand the competitive selling fare landscape… . Analysts are looking for more data, and more detailed data, to understand what products are selling and associated sell-up strategies. Understanding the

---

[255] ATPCOnews, *AI and Competitive Intelligence: Unlocking Opportunities While Managing Risks*, YouTube, at 35:56-36:31 (May 14, 2025), https://www.youtube.com/watch?v=DciPeya9sgQ (last visited Nov. 3, 2026).

[256] Kevin K. Wang, *Airline Revenue Management with Dynamic Offers: Bundling Flights and Ancillary Services* 3 (S.M. thesis, Mass. Inst. of Tech., May 2020), https://dspace.mit.edu/handle/1721.1/127110; Kevin K. Wang, *Airline Dynamic Offer Creation Using a Markov Chain Choice Model* (Ph.D. diss., Mass. Inst. of Tech., Feb. 2023), https://dspace.mit.edu/handle/1721.1/150196 (last visited Nov. 3, 2026).

[257] Press Release, *ATPCO Announces New Chairperson of the Board*, ATPCO (Apr. 3, 2023), https://atpco.net/single-press/atpco-announces-new-chairperson-of-the-board/ (listing "Scott Chandler, VP Revenue Management, American Airlines") (last visited Nov. 3, 2026).

[258] *See* Capture of 3Victors homepage as of June 22, 2024, *supra*.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

lowest selling fare is no longer enough."[259]

**K. Iris and PriceEye Completed the Process that ATPCO Had Started in 2019 After Identifying the Competitive Threat from Dynamic Pricing**

140. In 2017, ATPCO's research had shown that airlines pricing dynamically, unable to see one another's prices, could undercut one another until fares reached marginal cost.[260] The next year, the Wittman Dissertation explained what had held off such price wars under filed fares, and what could hold them off under dynamic pricing. Filed fares had let each airline watch the others: "repeated multimarket interactions and the public nature of filed fare structures serve as monitoring and punishment mechanisms for airlines that defect from the cooperative equilibrium."[261] Dynamic pricing threatened that watch, because "the facet of dynamic pricing that poses the greatest risk to the status quo of airline competition is the reduced ability of airlines to monitor the pricing actions of their competitors."[262] The dissertation predicted the answer: "It is very likely that similar technology would emerge to monitor dynamic pricing behavior," and "new monitoring technologies … would help prevent the race to the bottom as a result of dynamic pricing in the long run."[263]

141. A year after that, ATPCO published its standard for recording airlines' dynamic prices. The standard built two things. The first was the record itself. When an airline's pricing engine answered a traveler's search, the airline could send ATPCO a copy of the exchange, showing the fare the engine started from and the amount it changed, along with the request, which carried information about the traveler's search. ATPCO matched those copies against ticket sales, passed on the fares that sold, and kept the rest "for historical/analytical purposes."[264] The second was a common way to read the record. Each dynamic price was recorded as a fare already described in ATPCO's data, with its booking class, brand, and rules, at a different

---

[259] 3Victors White Paper at 8.

[260] *See supra* ¶¶ 54–56.

[261] Wittman Dissertation at 202.

[262] *Id.* at 217.

[263] *Id.* at 200, 218.

[264] *See supra* ¶¶ 76–77.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

amount. An offer of $214 recorded that way could be read as a particular kind of fare offered at a particular discount, and set beside a competitor's offer recorded the same way.[265]

142. In 2023, ATPCO's chief executive told the industry what ATPCO intended to do next for the airlines: a program where "you can see what your competitors [are] up to, [and] your [competitor] can see what you are up to."[266] Iris and PriceEye have now put this framework into practice. Iris handles the collection. It pulls records directly from the airlines' own systems, capturing what travelers search for and every price the airlines offer them in return.[267] PriceEye handles the monitoring. It compares each competitor's offer directly against the airline's own fares, and shows the airline when a rival has gone lower.

143. In the early 1990s, the Department of Justice sued ATPCO and eight airlines for using ATPCO to learn things about one another's fares that travelers could not. The resulting consent decrees tied what the airlines could see through ATPCO to what the public could see.[268] Dynamic pricing threatened the view of one another's prices that filed fares had given the airlines. It made possible what the Wittman Dissertation called "secret price cuts": discounts offered one traveler at a time, which competitors could not see and therefore could not quickly match.[269] As ATPCO's 2017 research showed, those secret cuts carried the risk of a price war ending at marginal cost.[270]

144. ATPCO systematically worked to eliminate that risk. Through Iris and PriceEye, ATPCO now supplies contributing airlines with their competitors' private offers, translates them into ATPCO's terms, and flags exactly when a rival has gone lower. By building a system of private data that shows each airline when a rival has gone lower, the defendants have successfully rebuilt what the government dismantled thirty years ago.

---

[265] *See supra* ¶¶ 71–72, 78.

[266] Skift Session at 8:01–8:10 (remarks of Alex Zoghlin, President and CEO, ATPCO, at Skift Aviation Forum, Fort Worth, Tex. (Nov. 1, 2023)).

[267] *See supra* ¶ 107.

[268] *See supra* ¶¶ 29–35.

[269] *See supra* ¶ 63.

[270] *See supra* ¶ 55.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

### L. Domestic Air Travel Constitutes the Relevant Antitrust Market

145. One tool that courts use to assess the competitive effects of concerted action is defining a relevant market, which is the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). The relevant antitrust market in this case is scheduled domestic air passenger transportation in the United States (the "Relevant Market").

#### 1. Domestic Air Travel constitutes the relevant product market.

146. The relevant product market is scheduled air passenger transportation between points in the United States ("Domestic Air Travel"). For most domestic trips, travel by car, bus, or train is not a reasonable substitute for flying. On a long trip, air travel takes hours where ground travel takes a day or more. A trip of 1,500 miles, for example, takes about four hours by air and more than twenty hours by car at highway speeds.

147. In 2021, DOJ alleged in *United States v. American Airlines Group Inc.* that scheduled air passenger service is not reasonably interchangeable with other modes of transportation. According to DOJ, "[d]ue to time savings and convenience afforded by scheduled air passenger service, not enough passengers would substitute other modes of transportation (car, bus, or train) to defeat a small but significant and non-transitory price increase by a hypothetical monopolist of scheduled air passenger service."[271] American, a Defendant here, agreed. The court found that "the parties agree, and the Court finds, that the relevant product market is 'scheduled air passenger service.'"[272]

148. Research commissioned by the International Air Transport Association ("IATA") estimates that, for travel within North America, the price elasticity of demand for air travel measured at the national level is approximately −0.9 for short-haul trips and −0.8 for long-haul

[271] Complaint, *United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558, ECF No. 1 (D. Mass. Sept. 21, 2021), at ¶ 39.

[272] *United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 117 (D. Mass. 2023), *aff'd*, 121 F.4th 209 (1st Cir. 2024).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

trips.[273] IATA explains that national-level figures describe how travelers respond to a price change that applies to all air travel from a country, such as a national departure tax, rather than a change on a single route.[274] An elasticity smaller than one in absolute value means that demand is inelastic: when the price of all air travel rises, the number of passengers falls by proportionally less than the price, because travelers have too few alternatives to turn to.

149. The federal government and the airlines treat scheduled air passenger transportation as a distinct line of business. An airline may provide air transportation only if it holds a certificate from the U.S. Department of Transportation ("DOT"); DOT may issue one only after finding that the airline is "fit, willing, and able to provide the transportation."[275] DOT's Bureau of Transportation Statistics ("BTS") collects and publishes traffic and market-share data for the airline industry, airline by airline.[276]

**2. The United States constitutes the relevant geographic market.**

150. The major U.S. airlines treat domestic air travel as a field of competition separate from international travel. United's annual report discusses domestic competition and international competition under separate headings. It states that "[t]he domestic airline industry is highly competitive and dynamic," and that "[d]omestic pricing decisions are impacted by intense competitive pressure exerted on the Company by other U.S. airlines." Internationally, by contrast, United reports that it "competes not only with U.S. airlines, but also with foreign

---

[273] Mark Smyth & Brian Pearce, Air Travel Demand, IATA Economics Briefing No. 9 (Apr. 2008), at 8 tbl. 1, https://www.iata.org/en/iata-repository/publications/economic-reports/air-travel-demand/ (last visited Nov. 3, 2026); *see also* InterVISTAS, Estimating Air Travel Demand Elasticities at vi-v (Dec. 28, 2007) (−0.88 and −0.80), https://www.iata.org/en/iata-repository/publications/economic-reports/estimating-air-travel-demand-elasticities---by-intervistas (last visited Nov. 3, 2026).

[274] Smyth, Air Travel Demand, *supra*, at 5, 26-27.

[275] 9 U.S.C. § 41101(a)(1); 49 U.S.C. § 41102(b)(1).

[276] Airline Domestic Market Share August 2025 – July 2026, Bureau of Transp. Stat., U.S. Dep't of Transp., https://www.transtats.bts.gov/ (last visited Nov. 3, 2026); Carrier Snapshots, Bureau of Transp. Stat., U.S. Dep't of Transp., https://www.transtats.bts.gov/Carriers.asp (last visited Nov. 3, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

carriers."[277]

151. Within the United States, any of these airlines may serve any part of the country, and they move aircraft and crews to where demand is. United reports that "any U.S. carrier deemed fit by the U.S. Department of Transportation" is "largely free to operate scheduled passenger service between any two points within the United States."[278]

152. Economists call the ability to shift capacity this way supply-side substitution: a seller that does not yet serve a group of buyers can begin serving them quickly with equipment it already has. September 2023, JetBlue and Spirit told a federal court that "airline networks are fluid."[279] Three months later, they told the same court that it had "heard witness after witness testify that the airline industry is highly dynamic," and that "supply-side substitution occurs routinely as airlines redeploy planes across their networks."[280]

153. JetBlue and Spirit have described domestic airline competition as national. In September 2023, they told the court that "airlines operating national networks are in the same relevant market because of their substitutability of supply," and that the trial evidence would show "a high degree of supply substitution in the airline industry."[281] In December 2023, they told the court that "[a]irlines compete nationally in numerous ways," and that "airlines choose their business model and on-board product offerings at the national level."[282] They also told the court that "the Government's experts expressly concede that airlines compete at the national level," and that the government's economic expert "concedes that a national market would pass

[277] United Airlines Holdings, Inc. & United Airlines, Inc., Annual Report (Form 10-K) (Feb. 12, 2026), https://www.sec.gov/Archives/edgar/data/100517/000010051726000023/ual-20251231.htm (last visited Nov. 3, 2026).

[278] *Id.*

[279] Defs.' Mem. in Opp'n to Pls.' Mot. in Limine Regarding Purported Out-of-Market Benefits, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511-WGY, ECF No. 196 (D. Mass. Sept. 20, 2023), at 10.

[280] Defs.' Proposed Conclusions of Law, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511-WGY, ECF No. 446 (D. Mass. Dec. 13, 2023), at ¶¶ 17, 24, at 6, 9.

[281] Defs.' Mem. in Opp'n to Pls.' Mot. in Limine Regarding Purported Out-of-Market Benefits, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511-WGY, ECF No. 196 (D. Mass. Sept. 20, 2023), at 10.

[282] Defs.' Proposed Conclusions of Law, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511-WGY, ECF No. 446 (D. Mass. Dec. 13, 2023), at ¶ 28, & at 10.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

the hypothetical monopolist test."[283]

## M. The Airline Defendants Collectively Possess Market Power in the Relevant Market

154. The Bureau of Transportation Statistics ("BTS"), a statistical agency of DOT, reports each airline's share of domestic revenue passenger miles. For the twelve months from August 2025 through July 2026, BTS reports these shares: Delta, 17.9 percent; American, 17.7 percent; United, 17.2 percent; Southwest, 17.1 percent; Alaska, 7.1 percent; and JetBlue, 4.6 percent. The four largest flew 69.9 percent of domestic revenue passenger miles, and the six together flew 81.6 percent.[284]

155. The figure below shows that the Defendants' combined passenger weighted share in the Domestic Scheduled Air Passenger Services has consistently remained above 80% for the entirety of the period between January 2017 to June 2025.




156. The four largest airlines are nearly equal in size, and no other airline approaches them. Each of the four flew between 17.1 and 17.9 percent of domestic revenue passenger miles

---

[283] *Id.* ¶¶ 33, 38, at 12, 14.

[284] Airline Domestic Market Share August 2025 – July 2026, Bureau of Transp. Stat., U.S. Dep't of Transp., https://www.transtats.bts.gov/ (last visited Nov. 3, 2026); Carrier Snapshots, Bureau of Transp. Stat., U.S. Dep't of Transp., https://www.transtats.bts.gov/Carriers.asp (last visited Nov. 3, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

in the twelve months from August 2025 through July 2026.. Frontier, the largest airline outside the six Airline Defendants, flew 3.9 percent.[285] DOJ has alleged that "[c]oordination becomes easier as the number of major airlines dwindles."[286]

157. In June 2026, the U.S. Government Accountability Office ("GAO") reported that "[f]rom 2008 through 2013, eight airlines consolidated to become four airlines," and that "there are fewer major U.S. airlines today than at any time since deregulation in 1978."[287] In 2023, a federal court reviewing the summary-judgment record in a class action over the airlines' domestic capacity quoted statements United executives had made to investors about the market share possessed by the four largest carriers. According to the court, United's chief executive said at a June 4, 2014 investor conference that in 2007 "nobody had more than 16% share of the US market," that the four largest carriers together "had about a 55% market share," and that "[t]oday those four carriers, post-merger, have over 80% market share." The court also quoted a United executive vice president, who said at a June 4, 2015 investor conference that "the top four largest carriers have over 80% of the domestic market share" and that "that's created a discipline in this business that didn't exist previously."[288]

158. The low-cost airlines that previously helped check the largest carriers' market power are shrinking. Spirit Airlines filed for bankruptcy twice within a year and stopped flying on May 2, 2026. In 2026, Allegiant acquired Sun Country. GAO reported that lower-cost airlines' market share grew substantially from 2007 through 2022, but "that growth has stalled in recent years."[289]

159. The largest airlines' loyalty programs and co-branded credit cards add to their

[285] Airline Domestic Market Share August 2025 – July 2026, Bureau of Transp. Stat., U.S. Dep't of Transp., https://www.transtats.bts.gov/ (last visited Nov. 3, 2026).

[286] Complaint, *United States v. US Airways Grp., Inc.*, No. 1:13-cv-01236, ECF No. 1 (D.D.C. Aug. 13, 2013), at ¶ 46.

[287] GAO-26-107740, *Airline Competition: Indicators Suggest Increased Competition in the Past Two Decades, but Lower-Cost Airlines Face Challenges*, U.S. Gov't Accountability Off. (2026), at 1, https://www.gao.gov/products/gao-26-107740 (last visited Nov. 3, 2026).

[288] *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 200 (D.D.C. 2023).

[289] *Airline Competition: Indicators*, *supra*.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

market power. Delta reported that its "remuneration from American Express totaled $8.2 billion" in 2025, "which we expect to grow to $10 billion over the next few years."[290] According to GAO, stakeholders and DOT officials said that the large airlines' credit card rewards programs give them a large revenue stream that helps them weather volatility and "exercise pricing flexibility."[291] According to DOJ, an airline seeking to enter or expand "must overcome the effects of corporate discount programs offered by dominant incumbents; loyalty to existing frequent flyer programs; a less well-known brand; and the risk of aggressive responses to new entry by the dominant incumbent carrier."[292] JetBlue and Spirit told a federal court that "the value of a loyalty program is driven to a large degree by the airline's network."[293]

## N. The Challenged Conduct Produces Anticompetitive Effects

160. ATPCO's products provide airlines with a current, carrier-by-carrier view of one another's prices, including dynamic prices that travelers cannot see together and that appear in no public fare data. DOJ, economists, and the research ATPCO commissioned have each tied that kind of information to reduced competition in the form of fewer price cuts and fewer price wars

### 1. The information exchanged through ATPCO has the features that DOJ associates with harm to competition.

161. DOJ has identified the features of exchanged information that make it likely to harm competition: how sensitive it is, how detailed it is, whether it is public, and how current it is.[294] In DOJ's words, "[e]xchanges of price, output, or cost information can 'stabilize prices' by encouraging or enabling competitors to match prices or to use each other as a benchmark in

---

[290] Delta Air Lines, Inc., Annual Report (Form 10-K) 4 (Feb. 11, 2026), https://www.sec.gov/Archives/edgar/data/27904/000002790426000013/dal-20251231.htm (last visited Nov. 3, 2026).

[291] *Airline Competition: Indicators*, *supra*.

[292] Competitive Impact Statement, *United States v. US Airways Grp., Inc.*, No. 1:13-cv-01236 (CKK), ECF No. 148 (D.D.C. Nov. 12, 2013), at 7.

[293] Defs.' Proposed Findings of Fact, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511-WGY, ECF No. 444 (D. Mass. Dec. 13, 2023), at ¶ 80.

[294] Statement of Interest of the United States, *In re Pork Antitrust Litig.*, No. 0:18-cv-01776, ECF No. 2616 (D. Minn. Oct. 1, 2024), at 12-17 ("Pork Statement of Interest").


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

pricing."[295] DOJ also stated that "exchanges of recent or future information carry far greater potential for anticompetitive effects than historical data."[296] The information exchanged through Iris and PriceEye has these features. It consists of prices, and DOJ has stated that "the more sensitive the information, the more it can be used to restrain competition."[297] It is not public: most of what Iris receives, including the searches themselves and the offers travelers never saw, appears nowhere else. And as alleged below, it is current, forward-looking, and broken down airline by airline and departure date by departure date.

162. Through ATPCO, participating airlines receive information about their rivals' prices that no airline could obtain by watching the market on its own. Dynamic prices offered in response to travelers' searches do not appear in filed fares, and an airline watching on its own sees only those it happens to search for.[298] Through ATPCO, each participating airline receives its rivals' prices, carrier by carrier, because its rivals contribute their shopping data to Iris on the condition that they receive shopping data in return.

163. The information exchanged through ATPCO is current and forward-looking.

- **It is current.** Iris collects shopping data "throughout the day, enabling multiple daily feeds" and "real-time market intelligence."[299] 3Victors promises contributing airlines insight "hour by hour, not day by day."[300] When ATPCO's chief executive introduced the clean-rooms program in 2023, he said a once-a-day feed of competitors' fares was "not going to work."[301] In 1992, according to DOJ, the airlines processed the fare changes ATPCO sent them each weekday into "detailed daily reports."[302]

---

[295] *Id.* at 13.

[296] *Id.* at 17.

[297] *Id.* at 13.

[298] *See supra* §§ D, F, and H.

[299] 3Victors White Paper at 10.

[300] Data, 3Victors, https://www.3victors.com/data (last visited Nov. 3, 2026) ("Why contribute?" tab).

[301] Skift Session at 6:47-7:40.

[302] *See supra* ¶ 32.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

- **It is forward-looking.** According to 3Victors, the PriceEye dashboard surfaces "[h]istorical trends and future outlooks,"[303] and airlines can "[v]iew future pricing and availability to identify competitive gaps, optimize positioning, and act before competitors do."[304] Its "Price Outlook" screens show competitors' prices for departure dates still to come.[305] PriceEye thus shows each airline what its rivals are offering for flights still to come.

164. PriceEye shows each airline its competitors' individual fares, each identified by the airline that offered it. Each customer chooses whom to watch: its input file "contains the instructions about what information you seek for us to collect on your behalf," including "which competitors."[306] 3Victors states that "[e]verything here is configurable down to the customer/profile level."[307] PriceEye also adds to each competitor's offer the fare basis code, booking class, and brand that identify which fare the rival is selling.[308] Its summary views even can be filtered by carrier.[309]

165. One PriceEye screen shows what this looks like in practice. In July 2025, 3Victors held a webinar to explain the PriceEye dashboard. One of the screens it displayed was titled "Detailed Anomalies."

166. The screen is simple to read. The screen shows an observation date of July 31, 2025. It lists one-way economy fares for departures over the following two weeks, from August 1 through August 13, 2025. Each row names a rival airline: United ("UA"), Southwest ("WN"), or Delta ("DL"). Each row gives the rival's total price, the customer airline's own total price, and

---

303 PriceEye, 3Victors, https://www.3victors.com/priceeye (last visited Nov. 3, 2026) ("How PriceEye works" section, "Insights" tab; "Analytics built for action" section).

304 This language was previously available on 3Victors' website as recently as October 4, 2026, but has since been deleted. *See* https://web.archive.org/web/20261004074310/https://www.3victors.com/priceeye.

305 *See supra* ¶ 126.

306 New PriceEye Dashboard at 7:57-8:12.

307 Data, 3Victors, https://www.3victors.com/data (last visited Nov. 3, 2026) ("How PriceEye works" diagram).

308 *Id.*

309 New PriceEye Dashboard at 32:40-34:05.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

the difference between them. A column headed "Competitive Position" labels each row "Undercut" or "Overpriced." Each price on the screen is one airline's fare for one departure date. Each row ends with a single word, either "Undercut" or "Overpriced."[310]




167. ATPCO itself had identified better information about rivals' prices as the remedy for the price war it warned dynamic pricing could cause. As discussed above, its 2017 presentation illustrated two airlines undercutting each other a dollar at a time, from $350 down to $99, below the $100 fare the slide labeled marginal cost, as alleged in Section D. The line directly beneath the illustration read: "Could [be] mitigated by the availability of improved pricing data."[311]

168. PriceEye supplies that information, and it is built around finding where an airline's fares differ from its rivals' fares. The "Detailed Anomalies" screen shows what counts as an anomaly in PriceEye's terms: each departure listed is one on which the airline's fare differs from a named rival's. Each row states the gap in dollars and labels it "Undercut" or "Overpriced." 3Victors describes the dashboard as surfacing "[m]arket undercuts and

[310] *Id.* at 34:41-35:20.

[311] 2017 ATPCO Presentation at slide 27.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

overpricing."[312] In a competitive market, a fare below a rival's is not an anomaly. It is what competition looks like. PriceEye flags it as one.

169. ATPCO and 3Victors have repeatedly marketed this feature as a way for airlines to monitor and respond to one another's prices. 3Victors states that configurable pricing alerts let airlines "react quickly,"[313] and (in now-deleted language) that its AI "surfaces sudden shifts, outliers, and undercuts"[314]:




170. In the July 2025 webinar, a 3Victors product manager said that the anomalies feature "points you towards the segments and the markets where the action's needed."[315] In September 2026, 3Victors wrote that "PriceEye's Anomaly Detection identifies pricing anomalies and prioritizes them based on revenue impact."[316] At Elevate 2026, ATPCO's chief

---

[312] PriceEye, 3Victors, https://www.3victors.com/priceeye (last visited Nov. 3, 2026) ("How PriceEye works" section, "Insights" tab).

[313] *Id.*

[314] This language was previously available on 3Victors' website as recently as October 4, 2026, but has since been deleted. *See* https://web.archive.org/web/20261004074310/https://www.3victors.com/priceeye.

[315] New PriceEye Dashboard at 36:35–36:49.

[316] Chris Phillips, Inside PriceEye: Turning Flight Shopping Data into Competitive Intelligence, 3Victors Blog (Sept. 9, 2026), https://www.3victors.com/blog/inside-priceeye-turning-flight-shopping-data-into-competitive-intelligence (last visited Nov. 3, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

commercial officer told airlines that with PriceEye, "competitive shifts surface automatically."[317]

171. The information PriceEye provides about each anomaly makes fare cuts less likely and fare increases more likely. An airline whose fare sits below a rival's learns how much it could raise that fare and still not exceed the rival's price. An airline that a rival has undercut learns exactly how far it must cut to match, on which departure dates, and against which rival. Every airline that uses PriceEye receives the same kind of report. An airline thinking about cutting a fare therefore knows that its rivals will see the cut, and its exact size, within hours. The cut will draw travelers only until those rivals match it. After that, the airline that cut first is left with a lower fare and few added travelers to show for it.

172. According to DOJ, ATPCO's fare data had this effect before the 1994 Decree, and ATPCO's own research anticipated the same effect for dynamic prices. DOJ alleged in 1992 that airlines used ATPCO's fare-filing devices to answer one another's discounts in ways their rivals understood. According to DOJ, ATPCO "in this way … facilitates the successful elimination of many discounts and discourages competitive pricing in the first place."[318] DOJ also alleged that ATPCO's devices facilitated "coordination that would not occur simply by virtue of the structure of the airline industry," and that "[w]ith these devices, the airlines can coordinate and achieve fare levels above those that otherwise would have prevailed."[319] The 1994 Decree then limited what the airlines could learn about one another's fares through ATPCO, as alleged in Section A. In 2017, when dynamic pricing was still largely prospective, ATPCO named better pricing data as the remedy for the price war that dynamic pricing could cause. The next year, the Wittman Dissertation predicted that technology to monitor airlines' dynamic prices would emerge, as alleged above. It added: "Even if this monitoring is not conducted in real-time, it may still serve as a deterrent to short-term undercutting."[320]

173. Seeing rivals' actual prices also prevents price wars that start by mistake. An

[317] ATPCO Elevate 2026 Transcript. At 5:46-5:50 (remarks of Chris Phillips, Chief Commercial Officer, ATPCO, at ATPCO Elevate 2026 (Apr. 21, 2026)).

[318] 1992 Competitive Impact Statement at 19.

[319] *Id.* at 14, 16.

[320] Wittman Dissertation at 200.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

airline that loses bookings without seeing its rivals' prices cannot tell whether a rival has cut its fare or demand has fallen. It may then cut its own fares in response to a cut that never happened. DOJ described this risk in 1992: "misconstruing a competitor's intentions could precipitate additional fare cutting."[321] ATPCO's 2017 research identified the same risk for dynamic prices, as alleged above. An airline that sees each rival's prices, carrier by carrier, can tell a rival's cut from a change in demand.

174. Taken step by step, the exchange works as follows:

- First, each participating airline's dynamic prices reach its rivals within hours, identified by carrier.
- Second, PriceEye flags fares that fall below a rival's and directs pricing teams to them.
- Third, a cut that rivals see and can match within hours wins few travelers, so an airline has less reason to make one.
- Fourth, airlines that can see one another's actual prices are less likely to answer cuts that never happened, so fewer price wars start.
- Fifth, fewer price cuts and fewer price wars mean higher fares.

### 2. The structure of the market compounds the anticompetitive effects of the challenged conduct.

175. Three features of Domestic Air Travel exacerbate the anticompetitive effect of the information exchange. A few airlines carry most travelers. New airlines cannot quickly enter or expand to undercut higher fares. And the major airlines meet one another across much of the country, every day, year after year.

176. **High Market Concentration.** A few airlines carry most domestic travelers, and nearly all of them take part in the exchange. Six airlines carry about four of every five domestic air travelers. In 2023, DOJ alleged that American, United, Delta, and Southwest "together control approximately 80% of flights nationwide."[322]

[321] 1992 Competitive Impact Statement at 16.

[322] Complaint, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511, ECF No. 1 (D. Mass. Mar. 7, 2023), at ¶ 11.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

177. **Barriers to Entry.** Higher fares would ordinarily draw new airlines into the market and lead smaller airlines to add flights, and that new service would push fares back down. That response depends on how quickly and cheaply new and smaller airlines can add service. In Domestic Air Travel, regulation, airport access, and the advantages of size all slow it.

178. A new airline must obtain DOT's certificate before it carries its first paying passenger, and it must file data to support DOT's finding that it is fit to provide service. It must also complete the Federal Aviation Administration's certification process.

179. Access to the busiest airports is limited. In 2013, DOJ stated that four of the busiest airports in the United States were subject to FAA limits on takeoffs and landings, called slots, and that the lack of available slots was "a substantial barrier to entry at those airports, especially for low-cost carriers." DOJ also stated that slots at those airports "are concentrated in the hands of large legacy airlines that have little incentive to sell or lease slots to those carriers most likely to compete aggressively against them." According to DOJ, at several large airports "a significant portion of the available gates are leased to established airlines under long-term exclusive-use leases."[323]

180. New and smaller airlines must also overcome the advantages that size gives the largest airlines. According to DOJ, an airline seeking to enter or expand "must overcome the effects of corporate discount programs offered by dominant incumbents; loyalty to existing frequent flyer programs; a less well-known brand; and the risk of aggressive responses to new entry by the dominant incumbent carrier."[324] JetBlue and Spirit told the court that "the value of a loyalty program is driven to a large degree by the airline's network."[325]

181. **Repeat Interactions.** The major airlines compete against the same rivals every day, across much of their networks, year after year. The Wittman Dissertation reported that "[a]irlines interact with their competitors repeatedly and indefinitely in a wide variety of

---

[323] Competitive Impact Statement, *United States v. US Airways Grp., Inc.*, No. 1:13-cv-01236 (CKK), ECF No. 148 (D.D.C. Nov. 12, 2013), at 7.

[324] *Id.* at 7.

[325] Defs.' Proposed Findings of Fact, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511-WGY, ECF No. 444 (D. Mass. Dec. 13, 2023), at ¶ 80.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

markets."[326] A seller that meets a rival only once can cut its price and keep the gain, because the rival has no later chance to answer. An airline that cuts a fare today faces rivals that can answer tomorrow, and wherever else their networks overlap. The more often airlines meet, the more a cut that rivals see costs the airline that made it. And the more a seen cut costs, the more it matters to that airline whether rivals see the cut within hours, which is what the exchange provides.

182. In 2023, DOJ alleged that "[m]any airlines also overlap on multiple routes, which provides opportunities for them to use fare increases or discounts on one route to influence or discipline a rival's behaviors on another route, all in coordinated pursuit of higher fairs."[327] It alleged that JetBlue and the four largest airlines use "cross-market initiatives" "to deter aggressive discounting and prevent fare wars." Under such an initiative, if an airline discounts on one route, "an affected competitor often retaliates by offering discounts on another route where the first airline prefers a higher fare." DOJ also alleged that these initiatives "often cause an airline to withdraw fare discounts."[328] DOJ gave an example from March 2019: American filed a low fare on one route, and JetBlue answered with low fares on several other routes American served. After American canceled its low fare, JetBlue withdrew its own.[329] The 2013 Complaint makes the same allegation about the legacy airlines' "cross-market initiatives."[330]

---

[326] Wittman Dissertation at 184.

[327] Complaint, *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511, ECF No. 1 (D. Mass. Mar. 7, 2023), at ¶ 50.

[328] *Id.* ¶¶ 50-51.

[329] *Id.* ¶ 51.

[330] Complaint, *U.S. v. US Airways Grp., Inc.*, No. 1:13-cv-01236, ECF No. 1 (D.D.C. Aug. 13, 2013), at ¶ 43 ("The legacy airlines also use what they call "cross-market initiatives," or "CMIs," to deter aggressive discounting and prevent fare wars. A CMI occurs where two or more airlines compete against each other on multiple routes. If an airline offers discounted fares in one market, an affected competitor often responds with discounts in another market—a CMI—where the discounting airline prefers a higher fare. CMIs often cause an airline to withdraw fare discounts. For example, in the fall of 2009, US Airways lowered fares and relaxed restrictions on flights out of Detroit (a Delta stronghold) to Philadelphia. Delta responded by offering lower fares and relaxed restrictions from Boston to Washington (a US Airways stronghold). US Airways' team lead for pricing observed Delta's move and concluded "[w]e have more to lose in BOSWAS … I think we need to bail on the [Detroit-Philadelphia] changes.").



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**3. Following the full roll-out of the ATPCO information exchange, airline prices soared.**

183. The effects of the exchange have shown up in what the Airline Defendants charge. By the start of 2026, every part of the exchange was in place. 3Victors introduced Iris in December 2024. PriceEye has delivered competitors' prices on a dashboard since July 2025.[331] By 2026, then, participating airlines could see one another's dynamic prices, carrier by carrier and departure date by departure date, within hours. PriceEye flagged for them every instance in which a rival had "[u]ndercut" them.[332] An airline considering a fare cut knew that its rivals would quickly see the cut.[333] 2026 was the first full year in which the exchange operated with all of these features present.

184. Once the exchange was in place, fares rose sharply as airlines stopped offering their lowest fares. Delta's chief executive described a "20% price increase, which largely we've taken this year," and "the limited amount of resistance that we see."[334] United's chief executive said he had been "pleasantly surprised at the industry's ability this year to raise yields and pass through much of the increase in fuel prices." An analyst told him: "you're all demonstrating so much more pricing power than I think any of us thought a few quarters ago."[335]

185. An airline that expects a seat to fly empty is better off selling it at any fare above the small added cost of carrying one more passenger (what economists call marginal cost), so in a competitive market the lowest fares can fall close to that cost.[336] In 2017, ATPCO warned that dynamic pricing could set off this kind of undercutting, and found that it could be mitigated by better data on competitors' prices.[337] In 2026, the airlines described those lowest fares as gone.

---

[331] New PriceEye Dashboard at 7:57-8:12.

[332] *See supra* ¶ 166.

[333] *See supra* ¶ 171.

[334] Delta Air Lines, Inc., Q3 2026 Earnings Call Transcript (Oct. 9, 2026) (remarks of Ed Bastian, Chief Executive Officer), https://s2.q4cdn.com/181345880/files/content_files/DAL-Edits-Final-Delta-Air-Lines-Inc-DAL-US-Q3-2026-Earnings-Call-9-October-2026-10_00-AM-ET.pdf (last visited Nov. 3, 2026), at 12.

[335] UAL Q3 2026 Earnings Call Transcript, Platform Aeronaut Transcripts, https://transcripts.platformaeronaut.com/transcripts/UAL-3Q26-transcript (last visited Nov. 3, 2026).

[336] *See supra* ¶¶ 54–56.

[337] *See supra* ¶¶ 48, 55–56.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

186. United's chief executive said in July 2026 that "[t]here's no more $9 fares from Houston to Central America or $4 tickets from Los Angeles to Cabo," and "I don't think it's ever going to exist again."[338] Delta's chief executive described the same change in July 2026. An analyst noted investors' concern, in light of "the industry's ability to hold on to fare increases," that low-fare carriers might "come in and undermine the structure as -- maybe as energy prices come off." Delta's chief executive answered that the last time fuel prices had been this volatile, nine or ten years earlier, low-cost carriers "looked [at] fuel as a competitive advantage because they had lower cost in other areas." He continued: "Some of them such as Southwest had fuel hedges in place, which they used to try to take market share. None of that exists any longer." Later in the same answer, he said: "there's nothing to be gained by trying to grow in that environment. The opportunity has to be in finding ways to secure higher revenues, not higher market share."[339]

187. The Airline Defendants chose fewer passengers over lower fares. United reported that its leisure load factor (the share of seats filled) fell 1.3 points in the third quarter, "a trade we would make every day."[340] American's chief commercial officer said that American "prioritized yield over load factor, proactively securing meaningfully higher yields in exchange for slightly lower loads." He did so even though "American traditionally has been a leader in load factor."[341] American's chief executive called it "a trade-off we're going to make every day of the week," stating: "But when you're taking a look at revenue performance that we've seen in double-digit

[338] United's chief commercial officer later corrected the second figure ("I think $14 is the accurate number") and said that such "incredibly low fares" "are no longer out there." *UAL Q2 2026 Earnings Call Transcript*, Platform Aeronaut Transcripts (July 16, 2026), https://transcripts.platformaeronaut.com/transcripts/UAL-2Q26-transcript (last visited Nov. 3, 2026).

[339] Delta Air Lines, Inc., Q2 2026 Earnings Call Transcript (July 10, 2026) (question of Michael Linenberg, Deutsche Bank Securities Inc.; remarks of Ed Bastian, Chief Executive Officer), https://s2.q4cdn.com/181345880/files/doc_events/2026/July/CORRECTED-TRANSCRIPT_-Delta-Air-Lines-Inc-DAL-US-Q2-2026-Earnings-Call-10-July-2026-10_00-AM-ET.pdf (last visited Nov. 3, 2026), at 9.

[340] United Airlines Holdings, Inc., Q3 2026 Earnings Call (Oct. 21, 2026), StockAnalysis, https://stockanalysis.com/stocks/ual/transcripts/709633-q3-2026/ (last visited Nov. 3, 2026).

[341] American Airlines (AAL) Q3 2026 Earnings Call Transcript, StockAnalysis, https://stockanalysis.com/stocks/aal/transcripts/713928-q3-2026/ (last visited Nov. 3, 2026).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

unit revenue increases, that's a trade-off we're going to make every day of the week."[342] After an analyst noted a two-point decline in Alaska's third-quarter load factor, Alaska's chief commercial officer said "there will be continued load pressure," explaining: "the load trade-off from the increase in yields we feel really good about."[343]

188. The Airline Defendants held fares up even as airlines lost money. United's chief executive said in October 2026 that "6 to 10 U.S. airlines are going to lose money this year."[344] American reported an adjusted loss for the third quarter of 2026 and projected an adjusted loss for the year, and Alaska reported a third-quarter GAAP net loss and projected an adjusted loss for the year.[345] American nonetheless gave up passengers to protect fares, and Alaska said it expected continued load pressure. An airline that is losing money and flying empty seats ordinarily has reason to cut fares to fill them. But that cut does not make sense ivals will see it and match it within hours, leaving the airline that cut first with a lower fare and few added travelers to show for it.[346]

189. Jet fuel prices rose sharply in 2026, but the airlines' executives described the industry's response as faster than in recent cycles and as more than a response to fuel. Delta's chief executive said that "structural change has accelerated, enabling the industry to recapture this year's fuel cost inflation at the fastest pace of any recent cycle."[347] American's chief

---

[342] Morgan Stanley's 14th Annual Laguna Conference, StockAnalysis, https://stockanalysis .com/stocks/aal/transcripts/753167-morgan-stanley-s-14th-annual-laguna-conference/ (last visited Nov. 3, 2026) (American Airlines transcript).

[343] Alaska Air Group (ALK) Q3 2026 Earnings Call Transcript, StockAnalysis, https://stock analysis.com/stocks/alk/transcripts/712741-q3-2026/ (last visited Nov. 3, 2026).

[344] United Airlines Holdings (UAL) Q3 2026 Earnings Call Transcript, StockAnalysis, https://stockanalysis.com/stocks/ual/transcripts/709633-q3-2026/ (last visited Nov. 3, 2026).

[345] American Airlines Grp. Inc., Q3 2026 Earnings Call (Oct. 22, 2026) (remarks of Devon May, Chief Financial Officer), https://americanairlines.gcs-web.com/events/event-details/q3-2026-american-airlines-group-inc-earnings-conference-call; Press Release, American Airlines Grp. Inc., American Sets New Revenue Records amid Historic Fuel Cost Pressure 1, 5 (Oct. 22, 2026), https://s202.q4cdn.com/986123435/files/doc_news/American-sets-new-revenue-records-amid-historic-fuel-cost-pressure-CORP-FI-10-2026.pdf; Press Release, Alaska Air Grp., Inc., Alaska Air Group Reports Third Quarter 2026 Results 1–2 (Oct. 20, 2026), https://news.alaskaair .com/wp-content/uploads/2026/10/Q3-2026-ALK-Earnings-Release.pdf.

[346] *See supra* ¶ 119.

[347] Delta Air Lines, Inc., Q2 2026 Earnings Call Transcript 4 (July 10, 2026) (remarks of Ed Bastian, Chief Executive Officer), https://s2.q4cdn.com/181345880/files/doc_events/2026/July/


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

executive described the 2026 fuel increase as the occasion for higher fares rather than their cause: "I think the fuel price increase that we've experienced has just been a catalyst to allow us to realize that there is value."[348]

190. Fares did not fall when fuel prices did. Jet fuel prices fell from May to June 2026. In July, United's chief executive said that "there were no fare decreases when fuel went down," and Southwest's chief executive said that "industry recapture has been swift and pricing has remained sticky."[349]

191. A fare increase that passes through a cost should recede when the cost ultimately does. Executives of four Airline Defendants told investors they expect to keep the increases. Delta's chief executive: "Fuel prices will recede… . And the test for us at Delta, and I think for the industry is to ensure that we sustain the revenue that we have created, and I don't see any reason why we shouldn't."[350] He also said that "current revenue momentum should remain sustainable even if fuel prices moderate,"[351] and that "the new baseline that we've established … we intend to hold that."[352] United's chief executive: "I certainly think pricing is going to

---

CORRECTED-TRANSCRIPT_-Delta-Air-Lines-Inc-DAL-US-Q2-2026-Earnings-Call-10-July-2026-10_00-AM-ET.pdf.

[348] American Airlines (AAL) Q3 2026 Earnings Call Transcript, StockAnalysis, https://stockanalysis.com/stocks/aal/transcripts/713928-q3-2026/ (last visited Nov. 3, 2026).

[349] United Airlines Holdings (UAL) Q2 2026 Earnings Call Transcript, StockAnalysis, https://stockanalysis.com/stocks/ual/transcripts/652978-q2-2026/ (last visited Nov. 3, 2026); Southwest Airlines Co., Q2 2026 Earnings Call Transcript (July 23, 2026) (remarks of Robert E. Jordan, President and Chief Executive Officer), https://d1io3yog0oux5.cloudfront.net/_09b512b2bf0ccf634bfc8c0e1a6aa39a/southwestairlines/db/938/9908/webcast_transcript/LUV+2Q26+Earnings+Call+Transcript.pdf.

[350] Delta Air Lines, Inc., Q3 2026 Earnings Call Transcript 12 (Oct. 9, 2026) (remarks of Ed Bastian, Chief Executive Officer), https://s2.q4cdn.com/181345880/files/content_files/DAL-Edits-Final-Delta-Air-Lines-Inc-DAL-US-Q3-2026-Earnings-Call-9-October-2026-10_00-AM-ET.pdf.

[351] Delta Air Lines, Inc., Q2 2026 Earnings Call Transcript 4 (July 10, 2026) (remarks of Ed Bastian, Chief Executive Officer), https://s2.q4cdn.com/181345880/files/doc_events/2026/July/CORRECTED-TRANSCRIPT_-Delta-Air-Lines-Inc-DAL-US-Q2-2026-Earnings-Call-10-July-2026-10_00-AM-ET.pdf.

[352] Delta Air Lines, Inc., Q3 2026 Earnings Call Transcript 12 (Oct. 9, 2026) (remarks of Ed Bastian, Chief Executive Officer), https://s2.q4cdn.com/181345880/files/content_files/DAL-Edits-Final-Delta-Air-Lines-Inc-DAL-US-Q3-2026-Earnings-Call-9-October-2026-10_00-AM-ET.pdf.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

stay."[353] American's chief executive: "the vast majority of that is something that we're going to be able to retain."[354] Alaska told investors that part of the earnings growth it expects in 2027 comes from "the annualization of this fare environment."[355]

192. In 2018, a doctoral dissertation drawing on the ATPCO-supported simulations identified information as the remedy for the price wars threatened by dynamic pricing: "By giving airlines additional information about the pricing actions of their competitors, airlines could maintain pricing discipline without costly price wars."[356] In 2026, the Airline Defendants' fares rose together. They did not fall when fuel fell. They are expected to stay up. All of this came after ATPCO introduced Iris and PriceEye.

## V. CLASS ACTION ALLEGATIONS

193. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Classes:

a. **Southwest, Alaska, and JetBlue Purchaser Class**: All persons who, within the past four years, purchased one or more tickets from Southwest, Alaska, or JetBlue for U.S. domestic air passenger transportation.

b. **United Purchaser Class**: All persons who, within the past four years, purchased one or more tickets from United for U.S. domestic air passenger transportation.

194. The following persons are excluded from the definitions of each Class: Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and

[353] United Airlines Holdings (UAL) Q3 2026 Earnings Call Transcript, StockAnalysis, https://stockanalysis.com/stocks/ual/transcripts/709633-q3-2026/ (last visited Nov. 3, 2026).

[354] Morgan Stanley's 14th Annual Laguna Conference, StockAnalysis, https://stockanalysis.com/stocks/aal/transcripts/753167-morgan-stanley-s-14th-annual-laguna-conference/ (last visited Nov. 3, 2026) (American Airlines transcript).

[355] Alaska Air Grp., Inc., Investor Day Transcript 19 (Sept. 29, 2026) (remarks of Shane Tackett, President and Chief Financial Officer of Alaska Airlines), https://news.alaskaair.com/wp-content/uploads/2026/10/AAG-Investor-Day-Transcript.pdf.

[356] Wittman Dissertation 218.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

that Judge's immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class definitions based upon information learned through discovery.

195. Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

196. This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Federal Rule of Civil Procedure 23.

197. **Numerosity:** Certification is appropriate under Federal Rule of Civil Procedure 23(a)(1) because the members of each Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs allege that there are estimated to be millions of individual purchasers who are members of one or more of the Classes. The precise number of Class members is unknown to Plaintiffs but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

198. **Commonality and Predominance:** Certification is appropriate under Federal Rule of Civil Procedure 23(a)(2) and (b)(3) because the claims of members of each of the Classes involve common questions of law and fact, which predominate over any questions affecting individual members of each of the Classes, including, without limitation:

a. Whether Defendants engaged in the conduct alleged in this Complaint;

b. Whether the act of setting up the information exchange alleged in this Complaint is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c. Whether using the information exchange to share pricing information as alleged in this Complaint is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

d. Whether Plaintiffs and other Class members paid artificially inflated fares for U.S. domestic air passenger transportation as a result of conduct



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

alleged in this Complaint that is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

e. Whether Plaintiffs and other Class members are entitled to treble damages and other remedies under Section 4 of the Clayton Act, 15 U.S.C. § 15, and if so, in what amount; and

f. Whether Plaintiffs and other Class members are entitled to injunctive relief and other remedies under Section 16 of the Clayton Act, 15 U.S.C. § 26, and if so, in in what form and on what conditions.

199. **Typicality:** Certification is appropriate under Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs' claims are typical of the claims of the other members of each of the Classes to which they belong. Plaintiffs and all other members of the Classes to which they belong suffered comparable injuries as a result of the unlawful conduct allected in this Complaint.

200. **Adequacy:** Certification is appropriate under Federal Rule of Civil Procedure 23(a)(4) because Plaintiffs are adequate representatives of each of the Classes. Plaintiffs' interests do not conflict with the interests of the other members of the Classes they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation. And Plaintiffs intent to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Classes.

201. **Superiority:** Certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because class action treatment is superior to other available methods for fairly and efficiently adjudicating the controversy among the parties. Among other things, class action treatment will allow many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require. The damages suffered by Plaintiffs and the other Class members are meaningful but relatively small compared to the burden and expense that would be required to litigate their claims individually. Accordingly, it would be impracticable for the members of the Classes to seek individual redress for Defendants' wrongful conduct. A


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

proliferation of individual claims would also present the risk of inconsistent or contradictory judgments, establish incompatible standards of conduct for Defendants, and increase the delay and expense to all parties and the court system. Meanwhile, no unusual difficulties are likely to be encountered in the management of this case as a class action. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a practicable method of obtaining redress and avoiding excessive and undue costs for the court system, substantially outweigh any difficulties that may arise in the management of this case as a class action.

## VI. CAUSES OF ACTION

### COUNT I
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### 15 U.S.C. § 1
### (On behalf of the Southwest, Alaska, and JetBlue Purchaser Class)

202. Plaintiff Ashley Ward, on behalf of the Southwest, Alaska, and JetBlue Purchaser Class, incorporates and realleges, as though fully set forth herein, each and every allegation against ATPCO, 3Victors, Delta, American, United, and Alaska set forth in the preceding paragraphs of this Complaint.

203. Beginning at a time currently unknown to Plaintiffs, but at least as early as November 4, 2022, and continuing through the present, Defendants ATPCO; 3Victors; Delta, American, and United (acting as owners of ATPCO); and Alaska (through its subsidiary, Hawaiian), along with co-conspirators not named as Defendants in this Count, including Southwest and JetBlue, entered into a continuing agreement to set up and maintain an information exchange in which horizontal competitors regularly share detailed, timely, competitively sensitive, and non-public shopping data, including dynamically generated prices charged for U.S. domestic air passenger transportation, under a "give-to-get" policy that requires users of the platform to share data in order to receive comparable data. The purpose of the agreement to set up and maintain this exchange is to give horizontal competitors greater visibility into one another's pricing, reduce competitive uncertainty, and maintain higher prices than would result if market participants set their own fares without access to real-time information about competitors' pricing decisions. This agreement is an unreasonable restraint of trade in


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

204. Defendants Delta, American, and United (acting as owners of ATPCO), Alaska (through its subsidiary, Hawaiian), and other co-conspirators who are owners or board members of ATPCO, are jointly and severally liable for ATPCO's unlawful actions in furtherance of this agreement. ATPCO is and has been jointly controlled by Defendants Delta, American, United, Alaska, and other horizontal competitors who own its shares and sit together on its board.[357] ATPCO's activities in setting up and maintaining the information exchange at issue in this case are a form of "concerted action" that "joins together separate decisionmakers" with "'separate economic interests.'" *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)).

a. Upon information and belief, ATPCO's owners are not merely passive equity holders or members. Each of ATPCO's owners appoints one of its own employees—specifically, in almost all cases, a pricing and revenue-management executive—to represent it on ATPCO's governing board.358

b. Upon information and belief, each seat on ATPCO's board belongs in practice to one of ATPCO's airline owners,359 not to the individual appointed to hold the seat. For example, one ATPCO press release describes an individual member as holding the role of "KLM Airlines

[357] *See, e.g.* ATPCO, *About ATPCO*, https://atpco.net/about/ (last visited Nov. 4, 2026) (describing ATPCO as "[o]wned by airlines") (prior version dating back to June 14, 2020, available at https://web.archive.org/web/20200614202230/https:/www.atpco.net/about); ATPCO, *ATPCO Announces New Chairperson of the Board* (Apr. 3, 2023), https://atpco.net/single-press/atpco-announces-new-chairperson-of-the-board/ (last visited Nov. 4, 2026) (listing board members, including Hawaiian's Chief Revenue Officer and similar officials at Delta, American, and United); *See* Compl., *United States v. ATPCO*, No. 92-2854 (D.D.C. filed Dec. 21, 1992), ¶¶ 4–12, 20, *available at* https://www.justice.gov/atr/case-document/file/483631/dl (alleging that each of the airline defendants in DOJ's 1992 suit—Alaska, American, Continental, Delta, Northwest, Trans World, United, and USAir—was an "owner of" ATPCO).

[358] *See, e.g.*, ATPCO, *ATPCO Announces New Chairperson of the Board* (Apr. 3, 2023), https://atpco.net/single-press/atpco-announces-new-chairperson-of-the-board/ (last visited Nov. 4, 2026) (listing board members).

[359] *See* Compl., *United States v. ATPCO*, No. 92-2854 (D.D.C. filed Dec. 21, 1992), ¶¶ 4–12, 20, *available at* https://www.justice.gov/atr/case-document/file/483631/dl (alleging that each of the airline defendants in DOJ's 1992 suit—Alaska, American, Continental, Delta, Northwest, Trans World, United, and USAir—was an "owner of" ATPCO).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

board member for ATPCO."[360] When an individual member moves on from a pricing and revenue-management role at the airline where the member is employed, that individual does not remain on ATPCO's board; instead, a successor from the same airline takes over that individual's board seat.[361]

c. Upon information and belief, ATPCO's board members approve ATPCO's product roadmap,[362] decide on details of its information-exchange activities, and set the rules for the exchange, including its "give-to-get" policy.

d. Upon information and belief, each of ATPCO's board members exercises these decision rights at the direction of that board member's airline employer, rather than as an individual decisionmaker serving solely ATPCO's independent commercial interests as a separate legal entity. For example, according to ATPCO, its "board airlines" have "approved" ATPCO's use of AWS Clean Rooms to "accelerate change in the airline pricing landscape."[363]

e. Within this structure, ATPCO's owners and board members "act on

[360] *See* ATPCO, *ATPCO Announces New Chairperson of the Board* (Apr. 3, 2023), https://atpco.net/single-press/atpco-announces-new-chairperson-of-the-board/ (last visited Nov. 4, 2026).

[361] *See, e.g.*, ATPCO, *ATPCO Appoints LATAM Airlines Group Executive Rosario Phillips as New Chair of the Board* (June 16, 2026), https://atpco.net/single-press/atpco-appoints-latam-airlines-group-executive-rosario-phillips-as-new-chair-of-the-board/ (last visited Nov. 4, 2026).

[362] *See* ATPCO, *ATPCO Leads Industry Transformation from Static Fare Filing to the Future of Airline Offers; Commits to Move Industry to 80% of All Airline Offers Dynamically Created by 2026* (Oct. 11, 2022), https://atpco.net/single-press/atpco-leads-industry-transformation-from-static-fare-filing-to-the-future-of-airline-offers-commits-to-move-industry-to-80-of-all-airline-offers-dynamically-created-by-2026/ (last visited Nov. 4, 2026) (referring to ATPCO's "Board-approved roadmap"); *ATPCO Announces New Chairperson of the Board* (Apr. 3, 2023), https://atpco.net/single-press/atpco-announces-new-chairperson-of-the-board/ (last visited Nov. 4, 2026) (same).

[363] *See* ATPCO, *ATPCO Leverages AWS Clean Rooms to Enable Airline Dynamic Offers Functionality at Scale* (July 21, 2023), https://atpco.net/single-press/atpco-leverages-aws-clean-rooms-to-enable-airline-dynamic-offers-functionality-at-scale/ (last visited Nov. 4, 2026) (emphasis added).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

interests separate from those of [ATPCO] itself." Am. Needle, 560 U.S. at 200. That is, each owner and board member's decision "reflects not only an interest in [ATPCO's] profits but also an interest in the [airline's] individual profits." Id. at 201. And the airlines' interests are "not necessarily aligned" with one another. Id. at 198. On the contrary, the airlines are separately incorporated entities that compete horizontally with one another. These competitors also have divergent incentives that are relevant to ATPCO's work. For example, some airlines might stand to gain, while others might stand to lose, from a more opaque pricing landscape in which airlines could quickly capture market share through aggressive discounting before competitors could respond.

f. By joining together to decide to exchange competitively sensitive shopping data and how to share that data, the airlines "deprive[] the marketplace of independent centers of decisionmaking" about whether and how to organize that sharing. Am. Needle, 560 U.S. at 199 (quoting Copperweld, 467 U.S. at 769). Accordingly, the decisions of ATPCO's owners and board members and the actions that ATPCO carries out with their approval are properly considered "concerted action" that is subject to antitrust scrutiny. Id. at 200–01.

205. Co-conspirators not named as Defendants in this Count, including Southwest and JetBlue, joined the agreement to maintain this "give-to-get" information exchange by agreeing to contribute their own competitively sensitive shopping data and by agreeing to pay fees to fund the exchange's operations.

206. The agreement alleged in this Count had the following effects, among others:

a. Restraining and suppressing price competition among Defendants Delta, American, United, and Alaska and their co-conspirators, including Southwest and JetBlue, in the market for U.S. domestic passenger air transportation;


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

b. Raising, maintaining, and/or stabilizing prices for U.S. domestic passenger air transportation at artificially high, non-competitive levels;

c. Depriving purchasers of U.S. domestic air passenger transportation from Defendants Delta, American, United, and Alaska and their co-conspirators, including Southwest and JetBlue, of the benefits of free and open competition.

207. As a result of the conspiracy, members of the Southwest, Alaska, and JetBlue Purchaser Class, including Plaintiff Ward, have been injured and will continue to be injured by paying more for U.S. domestic air passenger transportation purchased directly from Southwest, Alaska, and JetBlue, than they would have paid and will pay in the absence of the conspiracy.

208. Plaintiff Ward and other members of the Southwest, Alaska, and JetBlue Purchaser Class are entitled to treble damages from Defendants ATPCO, 3Victors, Delta, American, United, and Alaska, which are jointly and severally liable for overcharges that Plaintiffs and Class members have paid and will pay directly to members of the conspiracy—including co-conspirators Southwest, Alaska, and JetBlue—as a result of the violations alleged in this Count.

209. Plaintiff Ward and other members of the Southwest, Alaska, and JetBlue Purchaser Class are entitled to an injunction against Defendants ATPCO, 3Victors, Delta, American, United, and Alaska, preventing and restraining the violations alleged in this Count.

**COUNT II**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**15 U.S.C. § 1**
**(On behalf of the United Purchaser Class)**

210. Plaintiff Gregory Morris, on behalf of the United Purchaser Class, incorporates and realleges, as though fully set forth herein, each and every allegation against ATPCO, 3Victors, Delta, American, Southwest, Alaska, and JetBlue set forth in the preceding paragraphs of this Complaint.

211. Beginning at a time currently unknown to Plaintiffs, but at least as early as November 4, 2022, and continuing through the present, Defendants ATPCO; 3Victors; Delta and



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

American (acting as owners of ATPCO), Alaska (through its subsidiary, Hawaiian), Southwest, JetBlue, and other co-conspirators not named as Defendants in this Count, including United, entered into a continuing agreement to set up and maintain an information exchange in which horizontal competitors regularly share detailed, timely, competitively sensitive, and non-public shopping data, including dynamically generated prices charged for U.S. domestic air passenger transportation, under a "give-to-get" policy that requires users of the platform to share data in order to receive comparable data. The purpose of the agreement to set up and maintain this exchange is to give horizontal competitors greater visibility into one another's pricing, reduce competitive uncertainty, and maintain higher prices than would result if market participants set their own fares without access to real-time information about competitors' pricing decisions. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

212. Defendants Delta and American (acting as owners of ATPCO), Alaska (through its subsidiary, Hawaiian), and other co-conspirators who are owners or board members of ATPCO, are jointly and severally liable for ATPCO's unlawful actions in furtherance of this agreement. ATPCO is and has been jointly controlled by Defendants Delta, American, Alaska, and other horizontal competitors who own its shares and sit together on its board.[364] ATPCO's activities in setting up and maintaining the information exchange at issue in this case are a form of "concerted action" that "joins together separate decisionmakers" with "'separate economic interests.'" *See Am. Needle*, 560 U.S. at 195 (quoting *Copperweld*, 467 U.S. at 769).

a. Upon information and belief, ATPCO's owners are not merely passive equity holders or members. Each of ATPCO's owners appoints one of its

[364] *See, e.g.* ATPCO, *About ATPCO*, https://atpco.net/about/ (last visited Nov. 4, 2026) (describing ATPCO as "[o]wned by airlines") (prior version dating back to June 14, 2020, available at https://web.archive.org/web/20200614202230/https:/www.atpco.net/about); ATPCO, *ATPCO Announces New Chairperson of the Board* (Apr. 3, 2023), https://atpco.net/single-press/atpco-announces-new-chairperson-of-the-board/ (last visited Nov. 4, 2026) (listing board members, including Hawaiian's Chief Revenue Officer and similar officials at Delta, American, and United); *See* Compl., *United States v. ATPCO*, No. 92-2854 (D.D.C. filed Dec. 21, 1992), ¶¶ 4–12, 20, *available at* https://www.justice.gov/atr/case-document/file/483631/dl (alleging that each of the airline defendants in DOJ's 1992 suit—Alaska, American, Continental, Delta, Northwest, Trans World, United, and USAir—was an "owner of" ATPCO).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

own employees—specifically, in almost all cases, a pricing and revenue-management executive—to represent it on ATPCO's governing board.[365]

b. Upon information and belief, each seat on ATPCO's board belongs in practice to one of ATPCO's airline owners,[366] not to the individual appointed to hold the seat. For example, one ATPCO press release describes an individual member as holding the role of "KLM Airlines board member for ATPCO."[367] When an individual member moves on from a pricing and revenue-management role at the airline where the member is employed, that individual does not remain on ATPCO's board; instead, a successor from the same airline takes over that individual's board seat.[368]

c. Upon information and belief, ATPCO's board members approve ATPCO's product roadmap,[369] decide on details of its information-exchange activities, and set the rules for the exchange, including its "give-to-get" policy.

---

[365] *See, e.g.*, ATPCO, *ATPCO Announces New Chairperson of the Board* (Apr. 3, 2023), https://atpco.net/single-press/atpco-announces-new-chairperson-of-the-board/ (last visited Nov. 4, 2026) (listing board members).

[366] *See* Compl., *United States v. ATPCO*, No. 92-2854 (D.D.C. filed Dec. 21, 1992), ¶¶ 4–12, 20, *available at* https://www.justice.gov/atr/case-document/file/483631/dl (alleging that each of the airline defendants in DOJ's 1992 suit—Alaska, American, Continental, Delta, Northwest, Trans World, United, and USAir—was an "owner of" ATPCO).

[367] *See* ATPCO, *ATPCO Announces New Chairperson of the Board* (Apr. 3, 2023), https://atpco.net/single-press/atpco-announces-new-chairperson-of-the-board/ (last visited Nov. 4, 2026).

[368] *See, e.g.*, ATPCO, *ATPCO Appoints LATAM Airlines Group Executive Rosario Phillips as New Chair of the Board* (June 16, 2026), https://atpco.net/single-press/atpco-appoints-latam-airlines-group-executive-rosario-phillips-as-new-chair-of-the-board/ (last visited Nov. 4, 2026).

[369] *See* ATPCO, *ATPCO Leads Industry Transformation from Static Fare Filing to the Future of Airline Offers; Commits to Move Industry to 80% of All Airline Offers Dynamically Created by 2026* (Oct. 11, 2022), https://atpco.net/single-press/atpco-leads-industry-transformation-from-static-fare-filing-to-the-future-of-airline-offers-commits-to-move-industry-to-80-of-all-airline-offers-dynamically-created-by-2026/ (last visited Nov. 4, 2026) (referring to ATPCO's "Board-approved roadmap"); *ATPCO Announces New Chairperson of the Board* (Apr. 3, 2023), https://atpco.net/single-press/atpco-announces-new-chairperson-of-the-board/ (last visited Nov. 4, 2026) (same).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

d. Upon information and belief, each of ATPCO's board members exercises these decision rights at the direction of that board member's airline employer, rather than as an individual decisionmaker serving solely ATPCO's independent commercial interests as a separate legal entity. For example, according to ATPCO, its "board *airlines*" have "approved" ATPCO's use of AWS Clean Rooms to "accelerate change in the airline pricing landscape."[370]

e. Within this structure, ATPCO's owners and board members "act on interests separate from those of [ATPCO] itself." *Am. Needle*, 560 U.S. at 200. That is, each owner and board member's decision "reflects not only an interest in [ATPCO's] profits but also an interest in the [airline's] individual profits." *Id.* at 201. And the airlines' interests are "not necessarily aligned" with one another. *Id.* at 198. On the contrary, the airlines are separately incorporated entities that compete horizontally with one another. These competitors also have divergent incentives that are relevant to ATPCO's work. For example, some airlines might stand to gain, while others might stand to lose, from a more opaque pricing landscape in which airlines could quickly capture market share through aggressive discounting before competitors could respond.

f. By joining together to decide to exchange competitively sensitive shopping data and how to share that data, the airlines "deprive[] the marketplace of independent centers of decisionmaking" about whether and how to organize that sharing. *Am. Needle*, 560 U.S. at 199 (quoting *Copperweld*, 467 U.S. at 769). Accordingly, the decisions of ATPCO's owners and board members and the actions that ATPCO carries out with

---

[370] *See* ATPCO, *ATPCO Leverages AWS Clean Rooms to Enable Airline Dynamic Offers Functionality at Scale* (July 21, 2023), https://atpco.net/single-press/atpco-leverages-aws-clean-rooms-to-enable-airline-dynamic-offers-functionality-at-scale/ (last visited Nov. 4, 2026) (emphasis added).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

their approval are properly considered "concerted action" that is subject to antitrust scrutiny. *Id.* at 200–01.

213. Co-conspirators named as Defendants in this Count, including Southwest and JetBlue, and co-conspirators not named as Defendants in this Count, including United, joined the agreement to maintain this "give-to-get" information exchange by agreeing to contribute their own competitively sensitive shopping data and by agreeing to pay fees to fund the exchange's operations.

214. The agreement alleged in this Count had the following effects, among others:

a. Restraining and suppressing price competition among Defendants Delta, American, Alaska, Southwest, JetBlue, and their co-conspirators, including United, in the market for U.S. domestic passenger air transportation;

b. Raising, maintaining, and/or stabilizing prices for U.S. domestic passenger air transportation at artificially high, non-competitive levels;

c. Depriving purchasers of U.S. domestic air passenger transportation from Defendants Delta, American, Alaska, Southwest, JetBlue, and their co-conspirators, including United, of the benefits of free and open competition.

215. As a result of the conspiracy, members of the United Purchaser Class, including Plaintiff Morris, have been injured and will continue to be injured by paying more for U.S. domestic air passenger transportation purchased directly from United than they would have paid and will pay in the absence of the conspiracy.

216. Plaintiff Morris and other members of the United Purchaser Class are entitled to treble damages from Defendants ATPCO, 3Victors, American, Delta, Alaska, Southwest, and JetBlue, which are jointly and severally liable for overcharges that Plaintiffs and Class members have paid and will pay directly to members of the conspiracy—including co-conspirator United—as a result of the violations alleged in this Count.

217. Plaintiff Morris and other members of the United Purchaser Class are entitled to


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

an injunction against Defendants ATPCO, 3Victors, American, Delta, Alaska, and Southwest, preventing and restraining the violations alleged in this Count.

**COUNT III**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**15 U.S.C. § 1**
**(On behalf of the Southwest, Alaska, and JetBlue Purchaser Class)**

218. Plaintiff Ward, on behalf of the Southwest, Alaska, and JetBlue Purchaser Class, incorporates and realleges, as though fully set forth herein, each and every allegation against ATPCO, 3Victors, Delta, American, United, and Alaska set forth in the preceding paragraphs of this Complaint.

219. Beginning at a time currently unknown to Plaintiffs, but at least as early as November 4, 2022, and continuing through the present, Defendants Delta, American, United, and Alaska, along with co-conspirators not named as Defendants in this Count, including Southwest and JetBlue, entered into a continuing agreement to use ATPCO and 3Victors' products, including Iris and PriceEye, to share with one another detailed, timely, competitively sensitive, and non-public shopping data, including dynamically generated prices charged for U.S. domestic air passenger transportation, under a "give-to-get" policy that requires participants to share data in order to receive comparable data. The purpose of the agreement to share this data is to give horizontal competitors greater visibility into one another's pricing, reduce competitive uncertainty, and maintain higher prices than would result if market participants set their own fares without access to real-time information about competitors' pricing decisions. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

220. Co-conspirators not named as Defendants in this Count, including Southwest and JetBlue, joined the agreement to use ATPCO and 3Victors' products, including Iris and PriceEye, to share data in a "give-to-get" information exchange by agreeing to contribute their own competitively sensitive shopping data and by agreeing to pay fees to fund the exchange's operations.

221. The agreement alleged in this Count had the following effects, among others:



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

a. Restraining and suppressing price competition among Defendants Delta, American, United, and Alaska and their co-conspirators, including Southwest and JetBlue, in the market for U.S. domestic passenger air transportation;

b. Raising, maintaining, and/or stabilizing prices for U.S. domestic passenger air transportation at artificially high, non-competitive levels;

c. Depriving purchasers of U.S. domestic air passenger transportation from Defendants Delta, American, United, and Alaska and their co-conspirators, including Southwest and JetBlue, of the benefits of free and open competition.

222. As a result of the conspiracy, members of the Southwest, Alaska, and JetBlue Purchaser Class, including Plaintiff Ward, have been injured and will continue to be injured by paying more for U.S. domestic air passenger transportation purchased directly from Southwest, Alaska, and JetBlue, than they would have paid and will pay in the absence of the conspiracy.

223. Plaintiff Ward and other members of the Southwest, Alaska, and JetBlue Purchaser Class are entitled to treble damages from Defendants ATPCO, 3Victors, Delta, American, United, and Alaska, which are jointly and severally liable for overcharges that Plaintiffs and Class members have paid and will pay directly to members of the conspiracy—including co-conspirators Southwest, Alaska, and JetBlue—as a result of the violations alleged in this Count.

224. Plaintiff Ward and other members of the Southwest, Alaska, and JetBlue Purchaser Class are entitled to an injunction against Defendants ATPCO, 3Victors, Delta, American, United, and Alaska, preventing and restraining the violations alleged in this Count.

**COUNT IV**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**15 U.S.C. § 1**
**(On behalf of the United Purchaser Class)**

225. Plaintiff Morris, on behalf of the United Purchaser Class, incorporates and realleges, as though fully set forth herein, each and every allegation against ATPCO, 3Victors,



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

American, Delta, Alaska, Southwest, and JetBlue set forth in the preceding paragraphs of this Complaint.

226. Beginning at a time currently unknown to Plaintiffs, but at least as early as November 4, 2022, and continuing through the present, Defendants American, Delta, Alaska, Southwest, and JetBlue, along with co-conspirators including United, entered into a continuing agreement to use ATPCO and 3Victors' products, including Iris and PriceEye, to share with one another detailed, timely, competitively sensitive, and non-public shopping data, including dynamically generated prices charged for U.S. domestic air passenger transportation, under a "give-to-get" policy that requires participants to share data in order to receive comparable data. The purpose of the agreement to share this data is to give horizontal competitors greater visibility into one another's pricing, reduce competitive uncertainty, and maintain higher prices than would result if market participants set their own fares without access to real-time information about competitors' pricing decisions. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

227. The agreement alleged in this Count had the following effects, among others:

a. Restraining and suppressing price competition among Defendants American, Delta, Alaska, Southwest, and JetBlue, and their co-conspirators, including United, in the market for U.S. domestic passenger air transportation;

b. Raising, maintaining, and/or stabilizing prices for U.S. domestic passenger air transportation at artificially high, non-competitive levels;

c. Depriving purchasers of U.S. domestic air passenger transportation from Defendants American, Delta, Alaska, Southwest, and JetBlue, and their co-conspirators, including United, of the benefits of free and open competition.

228. As a result of the conspiracy, members of the United Purchaser Class, including Plaintiff Morris, have been injured and will continue to be injured by paying more for U.S. domestic air passenger transportation purchased directly from United, than they would have paid


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

and will pay in the absence of the conspiracy.

229. Plaintiff Morris and other members of the United Purchaser Class are entitled to treble damages from Defendants ATPCO, 3Victors, American, Delta, Alaska, Southwest, and JetBlue, which are jointly and severally liable for overcharges that Plaintiffs and Class members have paid and will pay directly to members of the conspiracy—including co-conspirator United—as a result of the violations alleged in this Count.

230. Plaintiff Morris and other members of the United Purchaser Class are entitled to an injunction against Defendants ATPCO, 3Victors, American, Delta, Alaska, Southwest, and JetBlue, preventing and restraining the violations alleged in this Count.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes of all others so similarly situated, respectfully request judgment against Defendants as follows:

A. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

B. The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

C. Plaintiffs and the Classes recover damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E. Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

F. Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

G. Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: November 4, 2026

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: */s/ Steve W. Berman*
Steve W. Berman (WSBA No. 12536)
By: */s/ Theodore Wojcik*
Theodore Wojcik (WSBA No. 55553)
By: */s/ Samuel E. Kurland*
Samuel E. Kurland (WSBA No. 64984)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
tedw@hbsslaw.com
sam.kurland@hbsslaw.com

Rio S. Pierce (*pro hac vice forthcoming)*
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile : (510) 725-3001
Email: riop@hbsslaw.com

*Attorneys for Plaintiffs*